850 F.2d 938
 100 A.L.R.Fed. 421, 57 USLW 2039, Fed.
Sec. L. Rep. P 93,905,
RICO Bus.Disp.Guide 6980
 Bertram FIELD, Plaintiff-Appellant,
v.
Julius TRUMP, Eddie Trump, Stuart M. Sloan, Samuel N.
Stroum, M. Lamont Bean, Fenwick Crane, E. Ronald Erickson,
Calvin Hendricks, Robert B. Hutchinson, Earl W. Smith,
Raymond C. Swanson, Pay'N Save Corporation, the Trump Group,
Ltd., NLAC Corp., Acquicorp, Inc., Mergicorp, Inc., TGAC
Corp. and TG Limited, Defendants-Appellees.
 No. 419, Docket 87-7578.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 6, 1988.
Decided June 30, 1988.
 
 Ira A. Finkelstein, New York City (William Klein II, Owen D. Kurtin, Tenzer, Greenblatt, Fallon & Kaplan, New York City, of counsel), for plaintiff-appellant.
 Joel M. Wolosky, New York City (Alvin M. Stein, Charles W. Stotter, Parker Chapin Flattau & Klimpl, New York City, of counsel), for defendants-appellees Julius Trump, Eddie Trump, M. Lamont Bean, E. Ronald Erickson, Calvin Hendricks, The Trump Group, Ltd., NLAC Corp., Acquicorp, Inc., Mergicorp, Inc., TGAC Corp. and TG Ltd.
 Thomas J. Schwarz, New York City (Thomas R. deRosa, David G. Cohen, Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel), for defendants-appellees Stuart M. Sloan and Samuel N. Stroum.
 Micheal H. Rauch, Terrence A. Corrigan, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants-appellees Fenwick Crane, Robert B. Hutchinson, Earl W. Smith, Raymond C. Swanson and Pay'n Save Corp.
 Before VAN GRAAFEILAND, WINTER and ALTIMARI, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 The legal issues in this appeal concern the meaning of the so-called "best-price rule" of Section 14(d)(7) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78n(d)(7) (1982), and the disclosure obligations of a publicly held company under that Act.
 
 
 2
 Accepting the allegations of the complaint as true, this dispute arises from a leveraged buy-out in which defendants Julius and Eddie Trump, through corporations they owned and controlled, commenced a tender offer at a price of $22.50 per share for shares of defendant Pay'n Save Corporation, a Washington state corporation. Shortly after the market closed on the fourth business day after the announcement of the tender offer, the Trumps "withdrew" the offer in order to arrange a purchase of a bloc of shares from certain dissident directors. Later that night, after acquiring an option to purchase the dissidents' shares, the Trumps announced a "new" tender offer at $23.50 per share. When the price of the option and a side payment for "fees and expenses" is taken into account, the dissidents received $25.00 per share, a $1.50 premium over the price paid to the tendering shareholders.
 
 
 3
 Bertram Field subsequently brought this class action in the Southern District against the Trumps, their firms, Pay'n Save and its officers and directors. The amended complaint alleged that the agreement between the Trumps and the dissident directors violated Section 14(d)(7), commonly known as the "best-price" provision of the Williams Act, and SEC Rule 10b-13. 17 C.F.R. Sec. 240.10b-13 (1987). In addition, the complaint alleged that various documents relating to the tender offer, and an earlier Pay'n Save proxy statement, contained material omissions, in violation of Sections 10(b), 14(a) and 14(e) of the '34 Act, 15 U.S.C. Secs. 78j(b), 78n(a), (e) (1982), Rules 10b-5 and 14a-9 thereunder, 17 C.F.R. Secs. 240.10b-5, 14a-9 (1987), and, of course, by extension, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1962(c), (d) (1982). Field alleged pendent state-law claims as well.
 
 
 4
 Judge Goettel dismissed the amended complaint under Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Field v. Trump, 661 F.Supp. 529 (S.D.N.Y.1987). The district court held that plaintiff did not state a claim under Section 14(d)(7) because the Trumps had announced an effective withdrawal of their tender offer before they struck their deal with the dissident directors, id. at 532, and that plaintiff was not a proper party to invoke Rule 10b-13. Id. at 533. The district court also dismissed the nondisclosure counts on the ground that they were attempts to bootstrap state-law fiduciary-duty claims into a federal securities-law action. Finally, Judge Goettel found that the complaint failed to allege a "pattern of racketeering activity" under RICO. We reverse the dismissal of the Section 14(d)(7) claim and the pendent state claims but otherwise affirm.
 
 BACKGROUND
 
 5
 According to the amended complaint, the allegations of which we must accept as true, this dispute originates in Pay'n Save's acquisition of Schuck's Auto Supply, Inc. in January 1984. That transaction left the former owners of Schuck's, defendants Samuel N. Stroum and Stuart M. Sloan and members of their families ("Stroums" or "Stroum Group"), holding 18.4% of Pay'n Save's outstanding common stock. The Stroums were not happy shareholders, however, and had their own ideas about how to run Pay'n Save. Looking for ways to pacify the Stroums, Pay'n Save management sought and obtained a standstill agreement dated March 30, 1984. The Stroums agreed not to sell or otherwise dispose of their shares, or to offer to purchase Pay'n Save. In return, Stroum and Sloan received seats on the company's board.
 
 
 6
 Friction between the Stroums and management nevertheless continued. As a result, management retained Kidder Peabody and later Merrill Lynch Capital Markets to find a purchaser for the company. To the same end, defendant Calvin Hendricks, Pay'n Save's Chief Financial Officer and Vice-Chairman of its board, undertook discussions with Eddie Trump, President of the Trump Group, Ltd., about acquiring Pay'n Save. According to its subsequent Offer to Purchase, the Trump Group took the position that it "would only consider an acquisition of the company if management would participate in the equity of the resulting entity." Offer to Purchase at 4. Management agreed, and on August 31 the Trumps proposed to the Pay'n Save board a cash tender offer at $22.00 per share for two-thirds of the company's outstanding shares, to be followed by a cash-out merger at the same price. One week later, in the early morning hours of a late-night Pay'n Save board meeting, the Trumps raised their offer to $22.50 but warned that it would be withdrawn if it were not approved. Merrill Lynch opined that $22.50 was a fair price, and a majority of Pay'n Save's board approved it. Stroum and Sloan dissented. That morning, September 7, 1984, Pay'n Save issued a press release announcing that it had reached a merger agreement with the Trumps and that the Trumps were initiating a tender offer at $22.50. In a statement of their own, the Stroums called the Trump offer "skimpy" and accused management of acting in "unseemly haste."
 
 
 7
 During the next few days, according to the Offer to Purchase, "Eddie Trump contacted Messrs. Stroum and Sloan and the parties had several conversations concerning the possibility of settling the objections of Messrs. Stroum and Sloan to the Transactions." Offer to Purchase at 6. At 5:10 p.m. on September 12, after a meeting between the Trumps, Stroum and Sloan, the Trumps told Pay'n Save's board that they were withdrawing their previously announced tender offer in order "to facilitate the negotiations with Messrs. Stroum and Sloan." Id. The Trumps also issued a press release announcing both the withdrawal of their tender offer and their negotiations with the Stroums. These negotiations quickly bore fruit. Later that night, the Trumps and the Stroums entered into a Settlement Agreement under which the Trumps paid the Stroums $3,300,000 for an option to purchase the Stroums' shares at $23.50 per share. In addition, the Trumps paid the Stroums $900,000 for the Stroums' "fees and expenses." The Settlement Agreement was subject to the Pay'n Save board's approval of an amendment to the September 7 merger agreement that would provide for an increased price of $23.50 per share for the tender offer and merger. The $4,200,000 payment (option price plus "fees and expenses"), when added to the $23.50 per share purchase price, amounted to a price of $25.00 per share for the Stroums.
 
 
 8
 The next day, September 13, the Pay'n Save board approved the amendment to the merger agreement, and Pay'n Save issued a press release announcing that the Trumps would soon proceed with a tender offer at the new $23.50 price. According to the complaint, the press release announcing the new price and the September 12 press release announcing the "withdrawal" reached the public simultaneously.
 
 
 9
 Claiming to have been a Pay'n Save shareholder who tendered shares for $23.50, a $1.50 less than the price paid to the Stroums, plaintiff brought this putative class action against Pay'n Save, its officers (M. Lamont Bean, Chairman of the Board and Chief Executive Officer; E. Ronald Erickson, President and Chief Operating Officer; and Calvin Hendricks, Vice Chairman of the Board and Chief Financial Officer), its pro-management directors (Fenwick Crane, Raymond C. Swanson, Robert B. Hutchinson and Earl W. Smith), the dissident directors (Stroum and Sloan), and the Trumps and their affiliated entities (Eddie Trump, Julius Trump, the Trump Group, Ltd., NLAC Corp., Acquicorp, Inc., Mergicorp, Inc., TGAC Corp. and TG Limited).
 
 
 10
 Count I of the complaint alleged that the $4,200,000 received by the Stroums constituted a premium of $1.50 per share above the price received by other shareholders, in violation of Section 14(d)(7) and Rule 10b-13. Count II alleged that the Trumps' Offer to Purchase and an earlier Pay'n Save proxy statement contained various omissions of material facts, in violation of Sections 10(b) and 14(e) of the '34 Act and Wash.Rev.Code Sec. 21.20.010 (1978). Count III alleged that Pay'n Save's officers and directors had conducted, and had conspired to conduct, the affairs of Pay'n Save through a pattern of racketeering activity, in violation of RICO, 18 U.S.C. Sec. 1962(c) and (d). Finally, Count IV alleged that, under the common law of the State of Washington, Pay'n Save's officers and directors had committed various breaches of their fiduciary duties of loyalty and care in connection with the sale of Pay'n Save.
 
 DISCUSSION
 1. The Section 14(d)(7) Claim
 
 11
 Plaintiff's principal claim arises under Section 14(d)(7) of the Williams Act, the so-called "best-price" provision, which states that:
 
 
 12
 Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.
 
 
 13
 15 U.S.C. Sec. 78n(d)(7). The purpose of this provision is to prevent a tender offeror from discriminating in price among tendering shareholders. The position taken by the SEC thus is that:
 
 
 14
 (i) a tender offer must be extended to all holders of the class of securities which is the subject of the offer (the "all-holders requirement"); and (ii) all such holders must be paid the highest consideration offered under the tender offer (the "best-price rule").
 
 
 15
 Proposed Amendments to Tender Offer Rules, Securities Act Release No. 6595 [1984-1985 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 83,797 (July 1, 1985). To codify the "all-holders requirement" and "best-price rule," the SEC has adopted Rule 14d-10, 17 C.F.R. Sec. 240.14d-10 (1987), which provides in pertinent part:
 
 
 16
 (a) No bidder shall make a tender offer unless:
 
 
 17
 (1) The tender offer is open to all security holders of the class of securities subject to the tender offer; and
 
 
 18
 (2) The consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer.
 
 
 19
 To the same end, the SEC has promulgated a rule prohibiting side transactions involving purchases of securities subject to a tender offer. Rule 10b-13 thus provides in pertinent part:
 
 
 20
 (a) No person who makes a cash tender offer or exchange offer for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer, from the time such tender offer or exchange offer is publicly announced or otherwise made known by such person to holders of the security to be acquired until the expiration of the period, including any extensions thereof, during which securities tendered pursuant to such tender offer or exchange offer may by the terms of such offer be accepted or rejected.
 
 
 21
 The essence of plaintiff's claim is that the $4,200,000 paid to the Stroums during the brief "withdrawal" of the offer was in law and fact a payment of a $1.50 per share premium intended to induce the Stroums to accept the tender offer. The failure to pay this premium to the other tendering shareholders, plaintiff argues, violated the "best-price rule."
 
 
 22
 No party disputes the proposition that payment of a premium to one shareholder and not others during a tender offer is illegal. The issue rather is whether the purported withdrawal effectively ended the offer so that the $4,200,000 payment was not during or part of a tender offer. In dismissing the Section 14(d)(7) claim, the district court relied upon SEC rules governing the commencement of a tender offer, specifically Rule 14d-2(b), which provides that:
 
 
 23
 [a] public announcement by a bidder through a press release, newspaper advertisement or public statement which includes the information in paragraph (c) of this section [namely, the identity of the bidder and the target, the amount and class of the securities sought, and the price to be paid] with respect to a tender offer ... shall be deemed to constitute the commencement of a tender offer [for the purposes of Section 14(d) and rules promulgated thereunder] Except, That such tender offer shall not be deemed to [have commenced under this section] on the date of such public announcement if within five business days of such public announcement, the bidder ... [m]akes a subsequent public announcement stating that the bidder has determined not to continue with such tender offer....
 
 
 24
 17 C.F.R. Sec. 240.14d-2(b) (1987) (emphasis added). Thus, while the public announcement of the essential terms of a tender offer results in the technical "commencement" of a tender offer, the offer will nevertheless be legally deemed not to have commenced if its withdrawal is announced within five business days. In the instant case, the initial announcement of the Trumps' tender offer came on the morning of Friday, September 7, 1984, and the purported withdrawal was announced on the afternoon of Wednesday, September 12, four business days later. Based on these facts, the district court concluded that, for purposes of Section 14(d)(7), "there was no tender offer in place at the time of the Settlement Agreement, and thus, as a matter of law, no violation of [that] Section." 661 F.Supp. at 532. We disagree, however, and believe that the allegations of the complaint state a claim under the Williams Act.
 
 
 25
 The Williams Act does not define "tender offer." Courts faced with the question of whether purchases of a corporation's shares are privately negotiated or are part of a tender offer have applied a functional test that scrutinizes such purchases in the context of various salient characteristics of tender offers and the purposes of the Williams Act. SEC v. Carter Hawley Hale Stores, 760 F.2d 945, 950 (9th Cir.1985); Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 56-57 (2d Cir.1985) (eight factor "test"; balancing of factors in particular case determined in light of Act's policy to protect ill-informed solicitees). Whether the acquisition of shares in a corporation is part of a tender offer for purposes of the Act cannot be determined by rubber-stamping the label used by the acquiror. Wellman v. Dickinson, 475 F.Supp. 783, 823-25 (S.D.N.Y.1979) (so-called "privately negotiated" purchases of shares constitute tender offer for purposes of Williams Act); aff'd on other grounds, 682 F.2d 355 (2d Cir.1982), cert. denied, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983). Were the label used by the acquiror determinative, virtually all of the provisions of the Williams Act, including the filing and disclosure requirements could be evaded simply by an offeror's announcement that offers to purchase of stock were private purchases. Id.
 
 
 26
 Similarly, giving effect to every purported withdrawal that allows a discriminatory premium to be paid to large shareholders would completely undermine the "best-price rule." For example, plaintiff has alleged that the purported withdrawal of the original tender offer was intended solely to allow the Trumps to pay a premium of $1.50 per share to the Stroums that was not offered to shareholders who tendered pursuant to the "new" tender offer announced immediately thereafter.[1] The "best-price rule" of Section 14(d)(7) and Rule 14d-10 is completely unenforceable if offerors may announce periodic "withdrawals" during which purchases at a premium are made and thereafter followed by "new" tender offers. Unless successive tender offers interrupted by withdrawals can in appropriate circumstances be viewed as a single tender offer for purposes of the Williams Act, the "best-price rule" is meaningless.
 
 
 27
 Whether the purchase of the Stroum shares was a private purchase or part of a continuing tender offer is not determined simply by the Trumps' use of the labels "withdrawal" and "new" offer. Cf. McDermott, Inc. v. Wheelabrator-Frye, Inc., 649 F.2d 489 (7th Cir.1980) (announcement of increase in number of shares sought not new tender offer). Indeed, we have explicitly recognized that purchases after a purported withdrawal of a tender offer may constitute a continuation of the offer in light of the surrounding circumstances. Hanson Trust, 774 F.2d at 58-59. Finally, Section 14(d)(7) itself explicitly treats a material change in the terms of a tender offer in the form of an increased price as a continuation of the original offer rather than as a new tender offer. Clearly, therefore, purchases of shares by an offeror after a purported withdrawal of a tender offer may constitute a continuation of the original tender offer.
 
 
 28
 Rule 14d-2(b) is not to the contrary. That Rule merely creates a window of time during which a genuine withdrawal leaves matters for all legal purposes as though a tender offer had never been commenced. The Rule does nothing to alter the principle that the mere announcement of a withdrawal may not be effective if followed by purchases of shares and other conduct inconsistent with a genuine intent to withdraw. The Rule is also irrelevant because a bidder is always free to withdraw a tender offer. The argument advanced by defendants, if correct, would thus apply even in cases in which the provisions of Rule 14d-2(b) governing withdrawal announcements did not.[2]
 
 
 29
 For purposes of the "best-price rule," therefore, an announcement of a withdrawal is effective when the offeror genuinely intends to abandon the goal of the original offer. See id. (termination of tender offer effective in light of evidence that goal of obtaining control of target corporation was abandoned). The complaint here alleges that the Trumps' Offer to Purchase explicitly stated that the purported withdrawal was intended to allow negotiations with the Stroums. Such negotiations indicate a continuing intent to obtain control of Pay'n Save.
 
 
 30
 Moreover, the complaint alleges conduct from which inferences might be drawn that the Trumps had not abandoned the goal of the original offer. In determining the most appropriate analysis for evaluating the conduct of an offeror surrounding a purported withdrawal, we draw upon a suggestion of Professor Loss. He has noted that the determination of whether formally separate offerings of securities should be "integrated," and thus considered a single offering, for the purposes of the various registration exemptions, is closely analogous to the question of whether single or multiple tender offers have been made. L. Loss, Fundamentals of Securities Regulation 577 n. 33 (1983) (suggesting comparison of " 'integration' problem with respect to certain exemptions under the 1933 Act" with Section 202(166)(B) of the ALI's proposed Federal Securities Code, which "treats [tender] offers as separate if they are for different classes of securities or are 'substantially distinct on the basis of such factors as manner, time, purpose, price and kind of consideration' ").
 
 
 31
 In establishing criteria to govern the integration of formally separate offerings, the SEC has identified the following factors, inter alia, as relevant: "(1) are the offerings part of a single of financing; (2) do the offerings involve issuance of the same class of security; (3) are the offerings made at or about the same time ...?" Section 3(a)(11) Exemption for Local Offerings, Securities Act Release No. 4434 (Dec. 6, 1961). Analogous factors may thus point to "integration" in the context of formally separate tender offers: (1) are the offers part of a single plan of acquisition; (2) do the offers involve the purchase of the same class of security; and (3) are the offers made at or about the same time? These factors are useful in determining the ultimate fact of whether an offeror has abandoned the goal of an initial tender offer in announcing a withdrawal of that offer. As previously noted, where the goal has not been abandoned, a purported withdrawal followed by a "new" offer must be treated as a single continuing offer for purposes of the "best-price rule."
 
 
 32
 Accepting as true the facts alleged in plaintiff's complaint, all of the listed factors weigh in favor of treating the Trumps' acquisition of Pay'n Save shares as a single tender offer. If the allegations are proven, the alleged $1.50 premium to the Stroums would violate Section 14(d)(7).
 
 
 33
 The parties and the district court have correctly assumed that Section 14(d)(7) impliedly affords a private right of action to shareholders. In Pryor v. United States Steel Corp., 794 F.2d 52, 57-58 (2d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 445, 93 L.Ed.2d 393 (1986), we held that the best-price provision's statutory neighbor, Section 14(d)(6) of the '34 Act, 15 U.S.C. Sec. 78n(d)(6) (1982), which requires pro rata acceptance of tendered shares in oversubscribed offers, could be privately enforced. Section 14(d)(7) certainly provides at least as strong a basis for the implication of a private remedy as does Section 14(d)(6). As in Pryor, the plaintiff here is "surely [one of] the primary intended beneficiaries of [the statute], since 'the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer.' " 794 F.2d at 57 (quoting Piper v. Chris-Craft Indus., 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977)). Moreover, Section 14(d)(7), like Section 14(d)(6) and "unlike the bulk of federal securities regulation, confers a substantive right on [its] beneficiaries," thereby "suggest[ing] that Congress intended to create a private right of action." Id. In addition, as is true of the proration provision, a private damage action provides a particularly effective means of enforcing the strictures of the "best-price rule." When a premium is paid to one shareholder in violation of Section 14(d)(7), "the injury is easy to calculate, the victims are easy to locate, and the likelihood of litigation by such victims is high if a private right of action exists." Id. at 58. Finally, a cause of action under Section 14(d)(7) is not one "traditionally relegated to state law." Id. (quoting Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975)). Accordingly, we hold that Section 14(d)(7) affords private plaintiffs an implied right of action, and we therefore reverse the dismissal of the Section 14(d)(7) claim.[3]
 
 2. The Nondisclosure Claims
 
 34
 Count II of the amended complaint alleged that the various documents relating to the Pay'n Save tender offer and merger, and an earlier Pay'n Save proxy statement, contained various omissions of material facts in violation of Sections 10(b), 14(a) and (e) of the '34 Act, and Rules 10b-5 and 14a-9. As the district court noted, most of these claims essentially allege that Pay'n Save's officers and directors breached their fiduciary duties of loyalty and care under Washington law and failed to disclose these breaches. For example, plaintiff alleged that the defendants had failed to disclose the following "material facts":
 
 
 35
 --"Value for the shareholders might have been ... maximized if the Stroums ... had been approached, as a potential acquirer."
 
 
 36
 --"The Standstill Agreement ... significantly restricted [Pay'n Save's] potential for maximi[z]ing value for its shareholders."
 
 
 37
 --"The Stroums ... might have been interest[ed] in acquiring all of the Company ... but were prevented from doing so because Management and [the] Directors had ... refused to approach them."
 
 
 38
 --"Neither Management nor [the] Directors made any effort at all to obtain for the [plaintiff] Class, the Premium paid to the Stroums, ... to obtain an independent and written legal opinion ... as to [the] validity [of the withdrawal], ... to adequately inform themselves of the advisability of entering into the Merger Agreement ..., to adequately inform themselves as to, or to determine what would constitute, a fair premium to the public shareholders ..., [and] to obtain $25 per share for the public shareholders...."
 
 
 39
 Amended Complaint paragraphs 54-55, 59 (emphasis omitted).
 
 
 40
 In Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977), the Supreme Court refused to construe Section 10(b) to prohibit "instances of corporate mismanagement ... in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." The Court held that Section 10(b), as its plain language suggests, prohibits only conduct "involving manipulation or deception," id. at 473, 97 S.Ct. at 1301, manipulation being "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artifically affecting market activity," id. at 476, 97 S.Ct. at 1302, and deception being "misrepresentation, or nondisclosure" intended to deceive. Id. Similarly, in Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 7-8, 105 S.Ct. 2458, 2461-62, 86 L.Ed.2d 1 (1985), the Court rejected the contention that "manipulative" conduct under Section 14(e) differed in scope from conduct deemed manipulative in Santa Fe under Section 10(b). The Court observed that "the three species of misconduct" targeted under both sections, namely " 'fraudulent, deceptive, or manipulative' " acts, "are directed at failures to disclose." Id. at 8, 105 S.Ct. at 2462 (citing 15 U.S.C. Sec. 78n(e)). The Court accordingly held that "the term 'manipulative' as used in [Section] 14(e) requires misrepresentation or nondisclosure," and "connotes 'conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.' " Id. at 12, 105 S.Ct. at 2464 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976)).
 
 
 41
 The Court in Schreiber did not, as it had in Santa Fe with respect to Section 10(b), express concern that the extension of Section 14(e) to conduct not involving misrepresentation or nondisclosure might "interfere with" or "federalize" state corporate law. Santa Fe, 430 U.S. at 479, 97 S.Ct. at 1304. Yet, as Schreiber's reliance on Santa Fe suggests, the policy against overriding state corporate law absent a clear indication of contrary congressional intent applies with equal force to Section 14(e). In anticipating Schreiber in Data Probe Acquisition Corp. v. Datatab, Inc., 722 F.2d 1 (2d Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984), we refused to "embark ... on a course leading to a federal common law of fiduciary obligations." Id. at 4; see also Lewis v. McGraw, 619 F.2d 192, 195 (2d Cir.) (per curiam), cert. denied, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980). Similarly, we have implicitly expressed our disapproval of the use of Section 14(a) and Rule 14a-9 "as an avenue for access to the federal courts in order to redress alleged mismanagement or breach of fidicuary duty." Maldonado v. Flynn, 597 F.2d 789, 796 (2d Cir.1979). We noted further in Maldonado that
 
 
 42
 [e]fforts to dress up [state-law claims] in a Sec. 14(a) suit of clothes have consistently been rejected, including allegations of failure to disclose a disputed legal theory regarding the legality of transactions approved by the board, failure to disclose an alleged ulterior motive for a fully described corporation action, or failure to disclose lack of skill or judgment in approving a transaction intended for the corporation's benefit.
 
 
 43
 Id. (citations omitted). Other courts have taken similar positions with respect to Section 10(b) and Rule 10b-5. See, e.g., Kas v. Financial Gen. Bankshares, Inc., 796 F.2d 508, 513 (D.C.Cir.1986) ("plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities law claim by alleging that directors failed to disclose that breach of fiduciary duty"; "if the validity of a shareholder's claim of material misstatement or nondisclosure rests solely on a legal determination that the transaction was unfair to a minority shareholder or that an officer or director's conduct amounted to a breach of his fiduciary duty, the claim does not state a cause of action under sections 10(b) or 14(a)"); Panter v. Marshall Field & Co., 646 F.2d 271, 287-89 (7th Cir.) (same under Section 10(b)), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir.1978) (same, Section 10(b)).
 
 
 44
 Language in Judge Friendly's opinion in Goldberg v. Meridor, 567 F.2d 209 (2d Cir.1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), a case not cited by the plaintiff, qualifies the broad proposition that there is no cause of action under Section 10(b) for non-disclosure of facts material only to support an action for breach of a fiduciary duty under state law. While conceding that some of the Court's statements in Part IV of Santa Fe squarely supported that proposition, Judge Friendly nevertheless stated:
 
 
 45
 Thus the Court, quoting from Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 40, 97 S.Ct. 926 , 51 L.Ed.2d 124 (1977), said that one factor in determining whether a case was covered by Sec. 10(b) and Rule 10b-5, was " 'whether the cause of action [is] one traditionally relegated to state law....' " But the Court quickly added, after referring to the Delaware appraisal statute, that "Of course, the existence of a particular state law remedy is not dispositive of the question whether Congress meant to provide a similar federal remedy," and it would be hard to think of a cause of action more "traditionally relegated to state law" than the one asserted in the Superintendent of Insurance case, which, as has been said, made "just plain stealing" a fraud under Rule 10b5, on the basis that Begole failed to tell the directors "in advance that he was going to steal", Jennings & Marsh, Securities Regulation 997-98 (1977).
 
 
 46
 Several sentences later, however, he also stated:
 
 
 47
 We readily agree that if all that was here alleged was that UGO had been injured by "internal corporate mismanagement," no federal claim would have been stated. But a parent's looting of a subsidiary with securities outstanding in the hands of the public in a securities transaction is a different matter; in such cases disclosure or at least the absence of misleading disclosure is required.
 
 
 48
 Id. at 220-21 (emphasis added).
 
 
 49
 We believe the following line to be drawn by our cases. Allegations that a defendant failed to disclose facts material only to support an action for breach of state-law fiduciary duties ordinarily do not state a claim under the federal securities laws. Certainly this is true of allegations of garden-variety mismanagement, such as managers failing to "maximiz[e] value for ... shareholders," Amended Complaint p 54, of directors failing "to adequately inform themselves," id., or of managers acting in a generally self-entrenching fashion. But where the remedy of an injunction is needed (and is available under state law) to prevent irreparable injury to the company from willful misconduct of a self-serving nature, disclosure of facts necessary to make other statements not misleading is required where the misleading statements will lull shareholders into forgoing the injunctive remedy.
 
 
 50
 In Goldberg, a parent corporation had transferred its assets and liabilities to a controlled subsidiary with public shareholders in exchange for more stock of the subsidiary. Contemporaneous press releases by the parent painted "an inviting picture ... of the transaction," 567 F.2d at 214. However, the parent's liabilities exceeded the shareholders' net equity by some $10 million, and the transaction transformed the subsidiary from a financially healthy corporation to a firm impaired by a $3.6 million deficit in current liabilities unable to meet its obligations and finding its assets seized by creditors. Id. at 212. Although the parent's control of the subsidiary obviated the legal need for shareholder approval and the disclosure attendant to proxy solicitation, the parent's optimistic press release tended to dispel any suspicion of the transaction. Lack of information about the parent's true financial condition in turn caused the public shareholders of the subsidiary to forgo the opportunity to seek an injunction under state law to prevent irreparable injury to the company.
 
 
 51
 Goldberg also involved out-and-out "looting" and "stealing." Those facts did not require us to distinguish between conduct that is "reasonable" and "unreasonable," or "informed" and "uninformed," distinctions that are the hallmark of state fiduciary law. Compare Maldonado, 597 F.2d at 796 (criticizing use of Section 14(a) to redress mismanagement and breaches of fiduciary duty), with Weisberg v. Coastal States Gas Corp., 609 F.2d 650, 655 (2d Cir.1979) (distinguishing Maldonado in light of "allegations of a cover-up of massive bribes and of kickbacks to directors"), cert. denied, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980). There is no allegation in the present case of willful misconduct of a self-serving nature that called for injunctive relief lest Pay'n Save's shareholders be irreparably harmed. At best, plaintiff alleges that the directors failed to maximize the return to shareholders, and thus his claims are not actionable under Sections 10(b), 14(a) or 14(e).
 
 
 52
 This conclusion does not dispose completely of the federal claims in Count II, however, because some of the nondisclosure allegations go beyond descriptions of ordinary breaches of fiduciary duties. Specifically, paragraph "fifty-sixth" of the amended complaint alleges that
 
 
 53
 The [Offer to Purchase and related documents] and the 1984 Proxy Statement were materially false and misleading in:
 
 
 54
 * * *
 
 
 55
 * * *
 
 
 56
 (2) Stating that the Stroums' Shares issued in the Schucks acquisition, were "valued at approximately $70 million" without disclosing the material fact that the Acquisition Price was equivalent to $25 per share.
 
 
 57
 (3) Failing to disclose the interrelationship of Bean's [management's] Directors as alleged in Paragraph SEVENTH hereof, and in burying their identity in Annex G at the end of the Offer to Purchase.
 
 
 58
 Amended Complaint p 56 (emphasis omitted). In determining whether these claims were properly dismissed under Rule 12(b)(6), we may of course refer to the Offer to Purchase and the 1984 Proxy Statement, which were annexed to defendants' motion to dismiss and are documents that are integral to plaintiff's claims. See Furman v. Cirrito, 828 F.2d 898, 900 (2d Cir.1987); 5 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1357, at 593 (1969); id. Sec. 1364, at 668-73.
 
 
 59
 With regard to the allegations in subparagraph (2), the Offer to Purchase states in clear language that in January 1984, Pay'n Save bought Schuck's Auto Supply by issuing the Stroums 2,799,014 shares of Pay'n Save stock, and that under the terms of the exchange these shares were worth $70 million. The omission of the $25-per-share figure is not material in light of the fact that dividing the number of shares into $70 million would disclose a price of $25.01 per share. The defendants' failure to perform this calculation for investors cannot be said to have "significantly altered the 'total mix' of information" available to reasonable investors, TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), and thus does not constitute actionable nondisclosure. See Datatab, 722 F.2d at 5 (no further disclosure required where "conclusion obvious to anyone conversant with elementary mathematics").
 
 
 60
 Moreover, the only possible relevance of the per-share value of the stock issued to the Stroums would be to illumine for investors the possible motives of the Stroums in demanding a $25 per share price. Even assuming that a motive other than profit maximizing was relevant, the circumstances were amply disclosed. For example, immediately after describing the terms of the acquisition of Schuck's Auto Supply from the Stroums for shares expected to be worth $70 million, the Offer to Purchase states that "[a]fter issuance on January 27, 1984, however, such Shares [the shares issued to the Stroums] had a quoted value in the over-the-counter market of $56,680,034." Offer to Purchase at 3. That the Stroums might have been upset at the performance of their new investment is obvious. Indeed, the Offer to Purchase understandably points out that "differences over the management of the Company ... developed after the closing of the transaction." Id. An explicit statement that the Stroums, pursuant to the fully-disclosed Settlement Agreement with the Trumps, effectively received the $25 per share they originally expected to receive in the Schuck's transaction, simply would not add anything material to the facts otherwise disclosed.
 
 
 61
 We turn now to subparagraph (3), which alleges first that the defendants failed to disclose the information described in paragraph "seventh" of the amended complaint, namely various social and professional relationships among the officers and directors of Pay'n Save. These include, for example, the alleged facts that Raymond C. Swanson, a director and Secretary of Pay'n Save, was a member of a law firm that represented Pay'n Save; that some of the directors were also co-directors of another company; and that three of the directors had known M. Lamont Bean, the Chairman and Chief Executive Officer of Pay'n Save, socially for many years. See Amended Complaint p 7. Such trivia, however, is immaterial as a matter of law, expecially in light of the extensive disclosure of management and director stock ownership and the terms of management's participation in the leveraged buy-out. Finally, the other allegation in subparagraph (3)--that the defendants violated their disclosure obligations by "burying" the identity of the directors in Annex G to the Offer to Purchase--is frivolous as a matter of law. See Kohn v. American Metal Climax, Inc., 458 F.2d 255, 267 (3d Cir.), cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972).
 
 3. The RICO Claim
 
 62
 The district court dismissed plaintiff's RICO claim on the ground that the alleged racketeering acts "were simply a series of events necessary to achieve a single objective, namely to take the company private," Field v. Trump, 661 F.Supp. at 535, and therefore did not establish a pattern under RICO. The plaintiff correctly argues that this legal conclusion is inconsistent with our decision in United States v. Ianniello, 808 F.2d 184, 189-93 (2d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987). However, the defendants correctly respond that the result reached by the district court--dismissal--is entirely consistent with our decisions in cases such as Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 51 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), which hold essentially that a scheme "carried out 'in pursuit of a single short-lived goal' " does not establish a RICO enterprise. Beauford v. Helmsley, 843 F.2d 103, 109 (2d Cir.1988) (quoting Creative Bath Prods., Inc. v. Connecticut Gen. Life Ins. Co., 837 F.2d 561, 564 (2d Cir.1988)), reh'g in banc granted (Apr. 1, 1988). Nevertheless, because we have recently decided to rehear Beauford in banc "to clarify Second Circuit law," 843 F.2d at 109, we will affirm on a different ground. Because we have found that plaintiff has not stated a valid claim that the Offer to Purchase or 1984 Proxy Statement were materially misleading, it follows that the complaint does not allege securities fraud or mail fraud for the purposes of establishing a pattern of racketeering activity under RICO. See Moss v. Morgan Stanley, Inc., 719 F.2d 5, 19 (2d Cir.1983), cert. denied, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).
 
 CONCLUSION
 
 63
 For the above reasons, the dismissal of Counts II and III of the complaint are affirmed. The dismissal of Count I is reversed. Because the reversal on Count I may restore pendent jurisdiction over the state-law claims in Counts II and IV, the dismissal of those claims is also reversed.
 
 
 64
 Affirmed in part and reversed in part.
 
 
 
 [1]
 Whether the "fees and expenses" for which the Trumps paid $900,000 to the Stroums were actually incurred is irrelevant under the "best-price rule." Some or all of those sums were expended in order to obtain a premium for the Stroums, and it would thwart the purposes of Section 14(d)(7) to allow reimbursement. Moreover, we believe the "best-price rule" would be unworkable if offerors were permitted to discriminate among shareholders according to expenses that were not uniformly incurred, such as broker's or attorney's fees
 
 
 [2]
 Defendants have emphasized that "the public shareholders of Pay'n Save ultimately received $23.50 per share, or approximately $5.00 per share in excess of the market value of their shares on the last full trading date prior to the announcement of the proposed tender offer and merger." Appellees' Joint Brief at 2-3. They apparently wish to stress that application of the "best-price rule" where a payment of a premium above the offer to a large shareholder is necessary to consummate the transaction will ultimately work to the detriment of shareholders generally by decreasing such transactions. This point, however, can be made about the Williams Act generally, see, e.g., Dynamics Corp. of Am. v. CTS Corp., 794 F.2d 250, 262 (7th Cir.1986) (citing Jarrell & Bradley, The Economic Effects of Federal and State Regulations of Cash Tender Offers, 23 J. Law & Econ. 371 (1980)), rev'd on other grounds, --- U.S. ----, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), and thus must be addressed to Congress
 
 
 [3]
 Because full relief is available to plaintiff under Section 14(d)(7), we need not address the claim asserted under Rule 10b-13. Cf. Pryor, 794 F.2d at 53; see also Beaumont v. American Can Co., 797 F.2d 79, 83-84 (2d Cir.1986) (expressing doubt that private right of action exists under Rule 10b-13)