Joseph **LERRO**, Plaintiff,

v.

The **QUAKER OATS COMPANY**, Loop Acquisition, Corp., and Thomas H. Lee, Defendants.

John **DUTY**, Plaintiff,

v.

The **QUAKER OATS COMPANY**, Loop Acquisition, Corp., and Thomas H. Lee, Defendants.

Nos. 94 C 6840, 94 C 7409.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 23, 1995.

Michael David Craig, Schiffrin & Craig, Ltd., Buffalo Grove, IL, and Mark C. Gardy and Seth Lapidow, Abbey & Ellis, New York City, for plaintiff.

Jerold Sherwin Solovy, Douglas Alan Graham, Jenner & Block, Chicago, IL, and Dennis J. Block, Weil, Gotshal & Manges, New York City, for defendants.

## *OPINION AND ORDER*

NORGLE, District Judge:

Before the court are two motions to dismiss—one filed in each case. Pursuant to 28 U.S.C. § 636(b)(1)(B), the court referred all pretrial matters for both cases to the magistrate. Magistrate Rosemond signed his eleven page report and recommendation on August 1, 1995, addressing both motions. The court finds the report and recommendation to be thorough and accurate, and was aided by the recommendation. For the reasons that follow, the court grants both motions to dismiss.

### I.

These cases stem from the 1994 purchase of Snapple Beverages Corp. ("Snapple") by The Quaker Oats Company ("Quaker"). Plaintiffs complain that the manner in which Quaker purchased Snapple violated the Securities Exchange Act of 1934, § 14(d)(7), 15 U.S.C. § 78n(d)(7). The following is the magistrate's concise rendition of the facts:

Plaintiffs Lerro and Duty are common stockholders of Snapple, which is a beverage producer. Defendant Quaker Oats, which sought to merge with Snapple, produces packaged foods and pet products. Defendant LOOP Acquisition is a wholly owned subsidiary of and was formed by Quaker Oats to facilitate the merger with Snapple.

Thomas H. Lee is also a defendant. At the time that Lerro filed suit, Lee had been a director of Snapple since April of 1992 and as a result of this position, beneficially owned approximately three percent of Snapple's outstanding public shares. Lee was also the general partner of, and investment advisor to, Thomas H. Lee Equity Partners, which provided Lee with beneficial ownership of an additional 31.9% of Snapple stock. Finally, Lee was the president and controlling shareholder of Thomas H. Lee. Co., which in turn owned 80% of Select Beverages, Inc., a beverage distributing company. All told, Lee personally and through various related entitles controlled about 70% of Snapple's common stock.

On November 1, 1994, Quaker Oats and Snapple entered into a Merger Agreement, which provided that LOOP Acquisition would commence a tender offer on November 4, 1994 for all outstanding shares of Snapple common stock.

Also on November 1, Snapple and Quaker Oats entered into several collateral agreements, including a Distributor Agreement. That particular agreement, which became effective upon the consummation of the Tender Offer, granted Select Beverages the perpetual and exclusive right to distribute Snapple and Quaker Oats' products in certain parts of the country. Quaker Oats did not enter into a similar deal with any other Snapple distributor. According to Quaker Oats, however, the newly consummated Distributor Agreement merely modified an earlier agreement which granted Select Beverages similar exclusive distribution rights.

On November 2, 1994, the *Dow Jones News Wire* publicly announced the merger between Snapple and Quaker Oats.

LOOP Acquisition commenced the Tender Offer on November 4, 1994. LOOP Acquisition paid each shareholder, includ-

ing Lee, $14.00 cash per share during the Tender Offer. On December 5, 1994, LOOP Acquisition consummated the Tender Offer.

(Report and Recommendation at 2–3.)

## II.

The issue before the court is whether Quaker Oats violated 15 U.S.C. § 78n(d)(7) and Rule 14d–10(a) of the Securities and Exchange Commission ("SEC").[1] Rule 14d–10(a) provides that "[n]o bidder shall make a tender offer unless ... the consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer." Section 78n(d)(7) is quite similar:

> Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.

15 U.S.C. § 78n(d)(7). These requirements are commonly referred to as the "best-price rule." In general, Plaintiffs contend that Quaker paid Lee more consideration for his shares of stock than others during the tender offer.

There is no dispute that Lee did receive exclusive rights to distribute certain products for Quaker. The central question is whether, by entering into that Distribution Agreement, Quaker increased Lee's consideration beyond that offered to others and thereby varied the terms of the tender offer before its expiration.

Regarding the Distributorship Agreement, as the magistrate noted, (1) although Select Beverages did receive rights to distribute, Select Beverages had enjoyed the same rights since March 1992, and (2) Lee received the same price per share, $14, as the other shareholders. (In addition, it should be noted that the distributorship agreement requires Lee to perform on the agreement as well as take on other obligations, Plaintiffs do not challenge the actual terms of the agreement, and furthermore, it does not necessarily follow that all distributorship agreements are successful.) Regarding the statute, the language of the rule and statute limits application of the statute and rule from the time the tender offer begins until the time it terminates. The magistrate first looked to SEC Rule 10b–13 which provides that a tender offer begins when it "is publicly announced or otherwise known by such person to holders of the securities to be acquired...." 17 C.F.R. § 240.10b–13. We agree that since the merger announcement was made November 2, 1994, that date is the start of the tender offer. Therefore, Quaker cannot be liable for improperly varying consideration during the tender offer because the Distribution Agreement was entered into November 1, 1994, the day before the tender offer began.

In concluding, the magistrate expressed that adopting Plaintiffs' argument which calls for a loose definition of "tender offer" would be unwise from a policy standpoint. "[W]e are unwilling to apply a broad reading to the plain language of the Williams Act because parties who work within the ambit of federal securities law need some semblance of certainty as to that law's application." (Report and Recommendation at 10.)

Plaintiffs argue that Rule 10b–13 has never, and should never, be used to define the term tender offer. They contend that both Congress and the SEC purposefully did not define tender offer in Rule 14d–10 to afford

---

1. The court notes that objections were untimely filed, yet the court elects to address the substantive issue. The magistrate signed the recommendation on August 1, the minute order is dated August 2, and the objections were filed August 18. Because service was by mail, any objections to the recommendation had to have been filed within 13 days after service, i.e., the mailing. *THK America, Inc. v. NSK, Ltd.*, 157 F.R.D. 651 (N.D.Ill.1994). Even adopting the minute order date (instead of the date the recommendation was signed) as the date of mailing, the computation establishes that objections should have been filed by August 15.

courts the latitude necessary for proscribing deals which attempt to circumvent the Williams Act. Plaintiffs continue that by mixing the two rules and strictly construing their application will render the Williams Act worthless. For support, Plaintiffs cite a 1995 Ninth Circuit case, *Epstein v. MCA, Inc.*, 50 F.3d 644 (9th Cir.1995), *cert. granted on other grounds*, —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 826 (1995).

We add that the principle intent underlying the best-price rule is to secure fair treatment for those who tender shares at the beginning of the tender offer, and to ensure equality among all security holders who tender their shares during the process generally. SEC Release No. 33–6596, 1985 WL 61507, at *3 (citing both the Senate and House Reports). By following the rules for defining the beginning and end of tender offers and other SEC rules (e.g., those pertaining to disclosure), fairness can be effectuated.

Also, this court agrees with the other jurisdictions that Congress purposefully did not define the term tender offer. *See Epstein*, 50 F.3d at 654; *Kahn v. Virginia Retirement Sys.*, 13 F.3d 110, 114 (4th Cir.1993); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 779 (2d Cir.1991); *Field v. Trump*, 850 F.2d 938, 943 (2d Cir.1988). In *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 598 (5th Cir. 1974), the Fifth Circuit Court of Appeals wrote:

> [W]e consider that the failure of Congress and the SEC to define "tender offer" was not inadvertent. On the contrary, it appears that the full meaning of the term was intentionally left to be developed on a case-by-case basis. Neither Congress nor the Commission was reticent in defining the [other] terms of the Williams Act when they chose to do so.

However, Congress' decision to leave the term tender offer undefined in that section does not indicate its intention that the procedural aspects of the Rule remain amorphous as well. The purpose for defining the term on a case-by-case basis is to include under the statute transactions that have the salient characteristics of a tender offer yet are labeled something else. *See generally* Nathan-

iel Smith, Note, *Defining 'Tender Offer' Under the Williams Act*, 53 Brook.L.Rev. 189 (1987) (discussing the Act as it relates to various unconventional tender offers). Simply because the statute and rules fail to describe every species of transaction that may be considered tender offers, the commencement of a tender offer need not be flexible. *See generally Kahn v. Virginia Retirement Sys.*, 783 F.Supp. 266, 269–70 (E.D.Va.1992).

We recognize that Rule 14d–10 does not demarcate a specific time frame for the commencement of a tender offer, so the court is persuaded to rely on its related rule, Rule 14d–2. The court also acknowledges that the Ninth Circuit does not apply Rule 10b–13 as the magistrate here suggested:

> In promulgating the all-holders, best-price Rule in 1986, the SEC gave no hint that its new regulation would be governed by Rule 10b–13's time clock.... Rule 10b–13 prohibits bidders from making side deals during a fixed period of time; it does not purport to serve as a general definition of when a tender offer begins and ends. In fact, in Rule 14d–2, the SEC rejected the notion that Rule 10b–13 timing determines when tender offers *start* for purposes of section 14(d)(7) and the rules promulgated thereunder.

*Epstein v. MCA, Inc.*, 50 F.3d 644, 655 (9th Cir.1995) (emphasis in original). Rule 14d–2 does not come out as strongly as implicated in *Epstein*. In the attached footnote, the *Epstein* court specified that under Rule 14d–2 a tender offer begins, not at the moment of the public announcement, but at 12:01 a.m. on the earlier of the date the tender offer is publicly announced or sent to securities holders. *Id.* at 655 n. 18. Nevertheless, without deciding Rule 10b–13's value here, applying Rule 14d–2 to Rule 14d–10 supports the court's conclusion that the agreement proceeded the tender offer. The language of Rule 14d–2 provides that its definition for the commencement of a tender offer applies generally "for the purposes of section 14(d) of the Act and the rules promulgated thereunder...." 17 C.F.R. § 240.14d–2. The district court in *Kahn* agreed that "Rule 14d–2 sets forth the elements required for com-

mencement of a tender offer under Rule 14d–10." *Kahn*, 783 F.Supp. at 269. The better course is to utilize Rule 14d–2 as the guideline for establishing the start date of the tender offer.

In further support of that proposition, we refer to the manner in which the SEC calculates Rule 14d–10's phrase "the highest consideration paid." SEC Rule 14d–10(a) requires that the consideration paid to any one security holder equal "the highest consideration paid to any other security holder during such tender offer." The SEC's position is that the highest consideration paid is determined from either the date the offer is first sent or published to security holders or, the date of public announcement, whichever is first. SEC Release No. 33–6596, 1985 WL 61507, at *3. A footnote to the Release hints that secure dates are essential: "The Commission believes that a determination by reference to the date of commencement is necessary to provide certainty to persons who make tender offers." *Id.* at n. 15.

The court views Rule 14d–10 as not a strictly technical requirement and that the timing of payments is not the sole focus of the Rule. However, the dates and times articulated with certainty in the statute and rules were not drafted with caprice. The court finds that it is more consistent with Congressional intent to refer to these rules as supportive of one another and to refrain from judicially setting the start date for tender offers on a case by case basis. *Pinter v. Dahl*, 486 U.S. 622, 651, 108 S.Ct. 2063, 2081, 100 L.Ed.2d 658 (1988) (recognizing that certainty and predictability are needed in the area of securities transactions).

The cases that have dealt with 15 U.S.C. § 78n(d)(7) and the timing issue are consistent with this court's holding. In *Field v. Trump*, 850 F.2d 938 (2d Cir.1988), the tender offer was withdrawn within five business days of the public announcement as allowed by 17 C.F.R. § 240.14d–2(b) (1987). Following the withdrawal, the offeror executed a settlement agreement with major shareholders. The next day the offeror publicly announced a "new" tender offer. The *Field* court reasoned that allowing periodic withdrawals which are followed by "new" tender

offers would circumvent the best-price rule. *Id.* at 944. Therefore, the court concluded, "purchases of shares … after a purported withdrawal of a tender offer may constitute a continuation of the original tender offer." *Id.*

The *Field* case focuses on efforts to purchase shares after a public announcement has been made. In this case, Plaintiffs ask that the tender offer start at some other time than as the SEC directed. The court agrees with the magistrate that *Field* is not on point.

The case on which the parties heavily relied is *Epstein v. MCA, Inc.*, 50 F.3d 644 (9th Cir.1995). In *Epstein*, Matsushita, the acquiring corporation, paid premiums to two major MCA shareholders in addition to the price per share offered to other shareholders. Matsushita approached the two shareholders, obviously, trying to insure that Matsushita would acquire a controlling portion of MCA. The plaintiffs claimed that Matsushita violated SEC Rule 14d–10. The *Epstein* court held that the transaction with Mr. Wasserman, who was MCA's chairman and who owned approximately five million shares, violated the Rule. The Ninth Circuit analyzed whether the Rule could be read to apply only within the period of the tender offer. The court found that the term "tender offer" has never been interpreted as a rigid period of time in federal securities law. *Id.* at 654. Thus, defendants could not be heard to argue that the Wasserman transaction fell outside the ambit of the tender offer because it occurred an hour and a half after the close of the tender offer:

> We therefore reject Matsushita's timing argument. Indeed, if adopted, it would drain Rule 14d–10 of all its force. Under Matsushita's reading, even the most blatantly discriminatory tender offer—in which large shareholders were paid twice as much as small shareholders—would fall outside Rule 14d–10's prohibition, so long as the bidder waited a few seconds after it accepted all of the tendered shares before paying the favored shareholders.

*Id.* at 655. The court concluded that the equality requirements should not be so easily circumvented. The *Epstein* court held that

the Wasserman transaction was so related to the tender offer that it was subject to Rule 14d–10's requirements. *Id.* at 656.

However, the Ninth Circuit proposed a hypothetical that is nearly on point here. The *Epstein* court explained:

> If, in advance of the tender offer, Wasserman had become unconditionally obligated to exchange his MCA shares, the transaction would not have violated Rule 14d–10, even if Matsushita believed that acquiring Wasserman's shares was a first step in acquiring MCA. In such a case, both Wasserman and Matsushita would have assumed the burdens of their agreement despite the risk that an anticipated tender offer would fail, or command a different price.

*Id.* at 656–57. In the case at bar, Lee was conditionally obligated. But, that difference is insufficient under the facts here to alter the holding. One cannot give what one does not have. The Distributorship Agreement was conditioned on the success of the tender offer only to the degree that Quaker could not assign company rights before it gained control of the company.

Furthermore, concerning *Epstein*'s treatment of Matsushita's timing argument, even rigid application of Rule 14d–10 will not result in emasculating the Williams Act. The statute and rules are designed to be read together. Standing alone, no one Rule could effectuate the fairness Congress intended to drive into such takeovers. Thus, for instance, if all security holders were properly made aware that favored shareholders would be paid twice as much moments after acceptance of the tendered shares, then the smaller shareholders could make an informed decision. As might be applied here, if the agreement with Lee had been one that should have been disclosed but was not (an issue not before the court), then another Rule would have been violated even though the tender offer had not commenced. By reading the statute and rules together, the Congressionally intended fairness can prevail while parties are afforded clear procedural guidelines.

For this case, the court finds, first, that the agreement was executed prior to the start of the tender offer; and, second, that the Distributorship Agreement is collateral to, thus, not a part of, the tender offer. Accordingly, that agreement did not alter the consideration tendered to the other shareholders during the tender offer.

### III.

For the foregoing reasons, both motions to dismiss are granted.

IT IS SO ORDERED.