KAHN, et al., Plaintiffs,

v.

VIRGINIA RETIREMENT SYSTEM,
et al., Defendants.

No. 91–551.

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 23, 1992.

Richard K. Bennett, Stephen T. Gannon, McSweeney, Burtch & Crump, Richmond, Va., Sidney B. Silverman, Silverman, Harnes, Obstfeld & Harnes, New York City, for plaintiffs.

Anthony F. Troy, Donald R. Lee, Mary C. Hohman, Mays & Valentine, Richmond, Va., for defendant Virginia Retirement System.

Stephen R. Larson, James L. Sanderlin, Leslie A. Grandis, McGuire, Woods, Battle & Boothe, Richmond, Va., for defendant CSX Corp.

James E. Farnham, Ann T. Burks, Allen C. Goolsby, C. Porter Vaughan, Robert A. Acosta–Lewis, John Owen Gwathmey, Hunton & Williams, Richmond, Va., for defendant RF & P Corp.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, in which all the Defendants have joined. In addition, the Commonwealth Defendants (Virginia Retirement System and System Holdings, Inc.) have filed a Motion to Dismiss based on the sovereign immunity granted by the Eleventh Amendment. For the reasons discussed below, the Defendants' Rule 12(b)(6) motion is granted, and the Commonwealth Defendants' motion is denied.

## FACTUAL BACKGROUND

This case arises out of the recent restructuring of RF & P Corporation (RF & P). While the incidents of the restructuring were complex, involving a series of related transactions, neither the timing nor the substance of these transactions appears to be much in dispute. The underlying facts have been thoroughly and publicly documented as they transpired. The adequacy of that disclosure has not been challenged. Thus, the question presented is not what happened factually, but rather what legal consequences attach to these facts.

Since 1983, defendant CSX Corporation has sought to acquire RF & P's railroad assets because RF & P's 113–mile rail line is critically situated in the heart of CSX's 19,200 mile network of rail lines, and links the old Chessie system (in the north) to the former Seaboard system (in the South). Without access to the RF & P rail lines, CSX would be forced to seek costly and inefficient methods of connecting its rail traffic. In 1985, RF & P formed a Special Committee to consider various alternative transactions in connection with CSX. From 1986 to early 1991, a sale of RF & P's railroad assets, an asset-stock exchange, a merger/cash-out, and a tender offer, were all proposed and eventually rejected by RF & P's Board of Directors.

Meanwhile, in February of 1991, prior to the RF & P restructuring, the Virginia General Assembly included in the state budget a directive that the Virginia Retirement System (VRS) transfer to the Commonwealth of Virginia approximately $71 million in exchange for the extinguishment of rights retained by the Commonwealth with regard to approximately 3.5 million shares of RF & P stock owned by VRS. See, Va.Code Ann. § 2.1–187 (Supp.1990).

On May 3, 1991, Governor Wilder signed this appropriation act into law. Prior to this transaction, the Commonwealth had enjoyed the right to purchase the RF & P stock from VRS, who could not sell it to anyone else, at the original purchase price and then could resell it to VRS, thus realizing any market appreciation on the stock. On June 28, 1991, the $71 million was transferred from VRS to the general fund of the State Treasury to obtain clear title for the 3.5 million shares.

On June 18, 1991, RF & P's Special Committee issued an announcement which stated that they had decided to recommend to the Board a revised joint transaction amongst RF & P, CSX, and VRS. (Def.Ex. 10.) Three days later, the RF & P Board issued a press release which stated that the Board had agreed in principle to the three-way transaction. *Id.* As described, the restructuring consisted of three separate parts. First, a tender offer would take place. On August 30, 1991, System Holdings, Inc. (SHI), a wholly-owned subsidiary created to effect the tender offer and to hold RF & P shares, commenced a public tender offer for all outstanding shares of RF & P at $39.00 per share (the "Tender Offer"). On October 9, 1991, SHI accepted for payment substantially all the RF & P shares held by the "public" shareholders.[1]

The second transaction was a sale of RF & P's railroad assets to CSX (the "Railroad Sale"), who at this time owned approximately 39% of RF & P's stock. On October 10, 1991, pursuant to a 1991 Asset Purchase Agreement which was executed on August 28, 1991, CSX acquired from RF & P its railroad assets in consideration for the transfer by CSX to RF & P of approximately 3.9 million shares of the non-voting RF & P stock. The net result of this transaction is that CSX exchanged the majority of its non-voting stock in RF & P and now controls and operates the railroad assets either as the owner or as the beneficiary of permanent easements.

The last part of the restructuring was a stock sale for cash (the "Stock Sale"). On October 10, 1991, pursuant to a 1991 Stock Purchase Agreement which was executed on August 28, 1991, VRS purchased from CSX approximately 2.97 million shares of RF & P voting and non-voting stock in exchange for a cash payment by VRS in the amount of $105.8 million. This figure represents a consideration of $35.58 per share. The net result of the Stock Sale was to eliminate CSX as the beneficial owner of 62.7% of the RF & P voting stock and to vest in VRS ownership of substantially all of the RF & P voting stock.

In short, RF & P is now a real estate company with no railroad operations; VRS beneficially owns substantially all of the outstanding RF & P stock; CSX owns and operates the railroad assets; and almost all of RF & P's public shareholders have received $39.00 per share in cash for their stock and are no longer shareholders of RF & P.

The Plaintiffs claim that the Tender Offer began on June 18, 1991, the date the Special Committee of RF & P issued its press release. By contrast, the Defendants maintain that the Tender Offer commenced on August 30, 1991. The crux of the Plaintiffs' Complaint is that subsequent to the announcement on June 18, 1991, defendants VRS and SHI, aided and abetted by CSX and RF & P, violated Section 14(d)(7) of the Exchange Act and SEC Rules 14d–10 and 10b–13. These provisions require that all holders of stock in a tender offer be paid the highest price offered to any stockholder during that period of time. The Plaintiffs claim that the "best price" rule was violated by the Defendants when it paid two stockholders more than $39.00 per share for their RF & P stock: (1) the Commonwealth received $48.21 per share on June 28, 1991; and (2) CSX received, under the terms of the Railroad Sale and Stock Sale, executed on August 28, 1991, cash and assets in excess of $39.00 per share.

The Complaint asserts three causes of action. Plaintiffs principle claim advances

---

1. The RF & P Schedule 14D–9 defines public shareholders as all shareholders who own RF & P shock other than VRS or CSX or their corporate affiliates. (*See*, Def.Ex. 5.)

a violation of the Williams Act.[2] Specifically, Plaintiffs claim that VRS and SHI violated Section 14(d)(7) of the Williams Act and Rule 14d–10 promulgated thereunder. Their second claim alleges violation of SEC Rule 10b–13. Finally, Plaintiffs assert a pendent common law claim for breach of fiduciary duty. The parties agree that if the Court dismisses first and second claims, then it should refuse to exercise jurisdiction over the state claim.

### MOTION TO DISMISS (ALL DEFENDANTS)

#### A. *Section 14(d)(7) of the Williams Act and Rule 14d–10*

■ The Plaintiffs first claim asserts that the Defendants violated Section 14(d)(7) of the Williams Act and Rule 14d–10 promulgated thereunder. Section 14(d)(7) states:

> Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.

15 U.S.C. § 78n(d)(7) (1988) (hereinafter Section 14(d)(7)). The Section 14(d)(7) requirement that any increase in consideration be available to all tendering shareholders is known as the "best price rule." Rule 14d–10 codifies the best price rule and requires that a person making a tender offer pay every tendering shareholder the highest consideration paid any other shareholder during the term of the tender offer. 17 C.F.R. § 240.14d–10 (hereinafter Rule 14d–10).

■ In order to establish a violation of Rule 14d–10, Plaintiffs must allege and prove, at a minimum, four elements: (1) that the bidder, (2) during the pendency of the bidder's tender offer, (3) purchased a security that is the subject of the tender offer, (4) for more consideration than the bidder paid to other shareholders pursuant to the tender offer.

The primary issue before the Court is whether the transactions with the Commonwealth and CSX occurred during the pendency of the tender offer. This question turns on the legal significance of the announcement on June 18, 1991 by RF & P's Special Committee and the announcement on June 21, 1991 by RF & P's Board of Directors. (Def.Ex. 10.) If these announcements are characterized not as the commencement of a tender offer by VRS, but, rather, as a fulfillment of RF & P's disclosure requirements under federal law, then this whole case should be dismissed.

Neither Congress nor the SEC has expressly defined the term "tender offer." This was apparently done intentionally since the dynamic nature of tender offers demands judicial flexibility in determining what types of acquisitions should be subject to the Williams Act. *Pin v. Texaco*, 793 F.2d 1448, 1453 (5th Cir.1986). A tender offer is "conventionally understood to be a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price." Note, *The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934*, 86 Harv.L.Rev. 1250, 1251 (1973).

As noted above, for Plaintiffs to assert any Rule 14d–10 claim, they must allege and prove that a tender offer commenced for purposes of Section 14(d)(7) and Rule 14d–10 *prior* to the occurrence of the purchases of which they complain.[3] Rule 14d–2 sets forth the elements required for commencement of a tender offer under Rule 14d–10. Rule 14d–2 provides that, in order to constitute commencement of a tender offer, "[a] public announcement *by a bid-*

---

**2.** 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f).

**3.** Plaintiffs do not dispute that all relevant agreements had been executed prior to VRS's and SHI's formal commencement of the tender offer on August 30, 1991.

*der* through a press release, newspaper advertisement or public statement ... *with respect to a tender offer*" must include: "(1) The identity of the bidder; (2) The identity of the subject company; and (3) The amount and class of securities being sought and the price or range of prices being offered therefor." 17 C.F.R. § 240.-14d–2(b) and (c) (1991) (emphasis added). A public announcement containing such information triggers the operation of all the tender offer rules.

The strict requirements for the commencement of a tender offer are a partial response to the SEC's recognition that public announcements frequently will be made to fulfill a party's obligations to make prompt public disclosure of material events. For instance, Rule 10b–5 requires that a company disclose to the public the existence of, or negotiations over, an agreement to sell or acquire securities. *Id.* at § 240.10b–5. In fact, the Supreme Court has held that a company must make a disclosure as soon as the information related to a potential transaction, even speculative information, becomes material to a reasonable investor. *Basic Inc. v. Levinson*, 485 U.S. 224, 238–41, 108 S.Ct. 978, 986–88, 99 L.Ed.2d 194 (1988). Thus, by law, RF & P had an obligation to make known to the public negotiations regarding a possible restructuring of the company.

The SEC has expressly recognized that a company's disclosure obligations may require that statements be made with respect to information concerning the company, and it would create insurmountable conflicts for a tender offer to be deemed commenced by virtue of such disclosure. The SEC could also not impose conflicting regulatory requirements on companies—on the one hand, require public disclosure of a material event such as a proposed tender offer and, on the other, treat the required disclosure as the commencement of a

tender offer which would thereby cause other transactions by the company to violate the federal securities laws. *See*, *S.E.C. v. Carter Hawley Hale Stores, Inc.*, 587 F.Supp. 1248, 1253 (C.D.Cal.1984) ("It would be perverse to hold that required disclosure under one rule is a prohibited solicitation under another rule." (citations omitted)), *aff'd*, 760 F.2d 945 (9th Cir.1985).

Despite these principles, the Plaintiffs maintain that the two public announcements made by RF & P in late June, 1991 commenced the actual tender offer. Focusing specifically on the June 18th release, the Plaintiffs argue that although the release does not explicitly identify the bidder, it is clear from the description of the overall transaction that the bidder is VRS. The release describes the transaction as an improved version of one proposed in August, 1990. Although it is not apparent from the June 18th press release, in that earlier deal, VRS had been identified as the bidder for RF & P stock.

In addition, the Plaintiffs submit a number of news articles in which it is apparent that the media had no difficulty in ascertaining the structure of the transaction and the identity of the tender offer bidder.[4]

Furthermore, Plaintiffs allege that the June 18th announcement was a joint announcement to which VRS was a party. As proof for this contention, the Plaintiffs point out that the release quotes Jacqueline G. Epps, the Chair of VRS' Board of Directors, who approved of the proposed deal.[5] The Chairman and CEO of CSX is also quoted. Again, the Plaintiffs argue that the press viewed the announcement as one in which VRS had taken part. For these reasons, Plaintiffs submit that there is enough evidence of a joint announcement to defeat a motion to dismiss. The Court finds that the Plaintiffs' arguments are without merit.

---

**4.** For example, The Washington Times published an editorial which stated:
 [The purchase of stock from CSX] would leave some 6 million shares (a little more than 33 percent) of RF & P outstanding in the hands of minority owners. VRS proposes to buy them out at $39.00 per share.

*Virginia Takes Stock*, Wash. Times, June 21, 1991, at F2.

**5.** Ms. Epps is quoted as saying only that "while the negotiations have been long and complicated, it appears that everyone stands to gain from the proposed transaction." (Def.Ex. 10.)

It is certainly true that a public announcement of the material terms of a tender offer in advance of the offer's formal commencement is detrimental to the interests of investors and results in many of the abuses the Williams Act was enacted to prevent. Such pre-commencement public announcements cause security holders to make investment decisions with respect to a tender offer on the basis of incomplete information and trigger market activity normally attendant to a tender offer, such as arbitrageur activity. If tender offer activity has begun as a result of a public announcement, the contest for control of the subject company will occur prior to the application of the Williams Act and will therefore deny security holders the protections which the Act was intended by Congress to provide. It is for these reasons that Rule 14d–2(b) was enacted. This provision allows investors and courts to easily distinguish between public announcements that start tender offers (and the application of the tender offer rules) and public announcements that do not.

■ The Court finds that the RF & P press release did not commence a tender offer, as a matter of law, because the release was not issued by VRS or SHI (the bidders), it does not state that there will be a tender offer, and it does not identify VRS or SHI as the bidder. The only reason why RF & P issued the press release was to comply with the mandatory disclosure requirements under Rule 10b–5 of the Exchange Act.

■ In a statement directly on point, the SEC has stated that:

1. *Question:* Will a public announcement by the subject company ... of a bidder's intention to make a cash tender offer together with the information referred to in Rule 14d–2(c) commence the five business day period in Rule 14d–2(b)?

*Response:* No. Only a public announcement by the bidder or on the bidder's behalf will commence a tender offer pursuant to any of the provisions of Rule 14d–2. As a practical matter, however, if a bidder's intention becomes generally known, the bidder may be unable to deny its intentions, and any affirmation of the information referred to in Rule 14d–2(c) by or on behalf of the bidder would cause the tender offer to start under Rule 14d–2(b).

Exchange Act Release No. 16623, 3 Fed. Sec.L.Rep. (CCH) Para. 24,284I, at 17,756 (Mar. 5, 1980). Here, there can be no reasonable inference that the June 18th announcement was made by VRS or on behalf of VRS. The press release itself seems to make clear that it was issued by the target company, RF & P, and not by the bidder, VRS or SHI. The announcement was issued on RF & P stationery and its headline reads: *"RF & P SPECIAL COMMITTEE ANNOUNCES REVISED TRANSACTION."* (Def.Ex. 10.) The press release goes on to outline the proposed transaction and includes several statements by C. Coleman McGehee, Chairman of the Special Committee. Mr. McGehee explains that the proposed transaction is still subject to a number of conditions, including approval by the RF & P Board of Directors. *Id.*

What the media understood and reported based on the press releases is not relevant, unless VRS had somehow positively affirmed the information contained in the newspaper articles. The Court looks solely to the official actions of the tender offer bidder, and the Plaintiffs have made no allegations that VRS in any way endorsed the press reports regarding the restructuring of RF & P. Thus, the Court's analysis is confined to considering the June 18th and June 21st press releases on their face.

The press release does refer to a cash exchange of $39.00 for "any and all shares" held by the public. However, nowhere in the press release is the term "tender offer" used, nowhere are fixed time limits announced, and, most importantly, nowhere is the identity of the bidder announced. The press release identifies and quotes Jacqueline Epps, but nothing in her statement could be reasonably inferred to mean that VRS was the bidder.[6] Given

6. *See supra* note 5.

the preliminary nature of the negotiations at the time, the proposed transaction, consistent with the RF & P press release, ultimately could have taken one of many forms, including a self-tender offer by RF & P, a merger, or an exchange offer.

In sum, neither the June 18th nor June 21st press releases constituted the formal commencement of a tender offer because 1) neither was issued by VRS, the bidder; 2) there is absolutely no evidence that the announcements were a joint effort or that they were made on behalf of VRS; and 3) the identity of the bidder to the proposed tender offer is not clear from the text of the statements.

As discussed above, the Defendants executed the Stock Sale and the Railroad Sale on August 28, 1991, prior to the announcement and formal commencement of the tender offer by SHI and VRS. The VRS/Commonwealth transaction occurred either on May 3, 1991, the date Governor Wilder signed the appropriations bill into law, or on June 28, 1991, the date actual payment was made from VRS to the general fund of the state treasury. The Court does not need to determine which event was the operative date since both occurrences were well before the start of the tender offer. Thus, because no purchases occurred during the pendency of the tender offer, the Plaintiffs' Section 14(d)(7) and Rule 14d–10 claims are dismissed. It is not necessary to consider any of the Defendants' additional arguments in support of dismissal of these claims.

### B. Rule 10b–13

■ Plaintiffs' second claim against the Defendants is for violation of Rule 10b–13. This rule states:

No person who makes a cash tender offer or exchange offer for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer, from the time such tender offer or exchange offer is publicly announced or otherwise made known by such person to holders of the security to be acquired until the expiration of the period.

17 C.F.R. § 240.10b–13 (1991). The rule operates to prohibit purchases during the tender offer period at any price, whether above, below, or at the price offered. Since no purchases were effectuated during the pendency of the tender offer, as stated above, the Plaintiffs' Rule 10b–13 claim is dismissed.

### C. Breach of Fiduciary Duty

■ The Plaintiffs' last claim is a state law action for breach of fiduciary duty. A district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). The parties and the Court agree that since all of the Plaintiffs' federal securities law claims have been dismissed, it would be in the interests of justice to decline to exercise supplemental jurisdiction over the Plaintiffs' state law claim.

### 11TH AMENDMENT IMMUNITY (COMMONWEALTH DEFENDANTS)

### A. Does the Eleventh Amendment Bar Suit Against States Under the Exchange Act

■ The Commonwealth Defendants, VRS and SHI, assert that they are immune from a suit brought by private citizens in federal court under the Exchange Act by virtue of the Eleventh Amendment. Although Congress may abrogate a state's sovereign immunity under the Eleventh Amendment for certain types of claims, to do so, it must make its intention unmistakably clear in the language of the statute. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246, 105 S.Ct. 3142, 3149, 87 L.Ed.2d 171 (1985); *Richard Anderson Photography v. Brown*, 852 F.2d 114, 117 (4th Cir.1988), *cert. denied*, 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989). Alternatively, a state could consent to a suit that would normally be barred by the Elev-

enth Amendment, but such consent must be given expressly and unequivocally. *Atascadero,* 473 U.S. at 247, 105 S.Ct. at 3149; *Brown,* 852 F.2d at 121.

 The Exchange Act does not mention the Eleventh Amendment nor does it attempt to condition a state's participation in securities transactions upon consent under the Exchange Act. However, Title 15 U.S.C. § 78c(a)(9) defines a "person" liable under the Exchange Act as follows:

The term 'person' means a natural person, company, government, or political subdivision, agency, or instrumentality of a government.

The Plaintiffs and Defendants disagree over how this provision should be interpreted.

The Plaintiffs rely on *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), in claiming that Congress specifically intended to abrogate the immunity conferred by the Eleventh Amendment in Exchange Act suits. In *Fitzpatrick,* a case under Title VII with a nearly identical definition of "person," the Supreme Court found the "threshold fact of congressional authorization" to sue the state for money damages in the inclusion in the definition of "person" the terms "governments, governmental agencies, [and] political subdivisions." *Id.* at 449, 96 S.Ct. at 2668.

However, the Plaintiffs ignore the fact that *Fitzpatrick* relied heavily upon the legislative history of the 1972 amendments to Title VII which demonstrated a clear intent to abrogate sovereign immunity. Prior to 1972, Title VII expressly excluded from its coverage "a state or political subdivision thereof." 42 U.S.C. § 2000e(b) (1970 ed., Supp. IV). That express exclusion was deleted by § 2(1) of the Equal Employment Act of 1972, which also amended 42 U.S.C. § 2000e(f) to include within the definition of "employee" those individuals "subject to the civil service laws of a State government, government agency or political subdivision." 42 U.S.C. § 2000e(f). The term "state" includes a State of the United States, the District of Columbia, etc. *Fitzpatrick,* 427 U.S. at 449 n. 2, 96 S.Ct. at 2668 n. 2. These amendments demonstrate a clear congressional intent to abrogate Eleventh Amendment immunity for purposes of Title VII. *Id.* By contrast, there is no such comparable legislative history or language referring specifically to state governments in the Exchange Act. Thus, *Fitzpatrick* and Title VII can clearly be distinguished from the Exchange Act.

Other courts have been unable to ascertain any congressional intent to abrogate sovereign immunity in regards to the Exchange Act. *See, Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.,* 730 F.Supp. 74 (W.D.Mich.1990); *Finkielstain v. Seidel,* 692 F.Supp. 1497 (S.D.N.Y.1988), *aff'd in part, rev'd on other grounds,* 857 F.2d 893 (2d Cir.1988); *Charter Oak Fed. Sav. Bank v. Ohio,* 666 F.Supp. 1040 (S.D.Ohio 1987). Similarly, this Court finds that Eleventh Amendment immunity has not been abrogated under the Exchange Act.

**B.** *Whether VRS and SHI Deserve the Protection of the 11th Amendment*

 A state agency or state entity shares a sovereign's Eleventh Amendment immunity if it is an instrumentality of the state. *See Jacobs v. College of William and Mary,* 495 F.Supp. 183, 190 (E.D.Va. 1980), *aff'd,* 661 F.2d 922 (4th Cir.1980). Such an entity, however, may not seek shelter under a state's Eleventh Amendment immunity if it has power sufficiently distinct and independent as to be not considered merely a part of the state or merely its alter ego. *Artist v. Virginia Int'l Terminals, Inc.,* 679 F.Supp. 587 (E.D.Va. 1988), *aff'd,* 857 F.2d 977 (4th Cir.1988). The parties agree that the Court should consider the following eight factors in determining whether VRS and SHI enjoy the Commonwealth's immunity:

1. Whether and to what extent any judgment will be payable from the state treasury;

2. The extend of funding provided to the institution by the state;

3. The extent of the state's control in appointing the governing body of the institution;

4. The degree of the institution's autonomy over its operations;

5. Whether the institution is separately incorporated;

6. Whether it has the power to sue and be sued and to enter into contracts;

7. Whether its property is immune from state taxation; and

8. Whether the institution's function is governmental or proprietary.

The parties take opposite positions as to each of the eight *Artist* factors. Resolving the tension between the parties would require the Court to make numerous factual determinations regarding the functions of VRS and SHI and their interaction with the Commonwealth of Virginia. Given the longstanding rule that the allegations in the Complaint should be construed in the light most favorable to the non-moving party, *Adams v. Bain*, 697 F.2d 1213 (4th Cir.1982), the Court finds that dismissal of the case against the Commonwealth Defendants based on Eleventh Amendment grounds is inappropriate at this stage of the proceedings. Thus, the Commonwealth Defendants' Motion to Dismiss is hereby denied.

### CONCLUSION

As a matter of law, the RF & P press releases issued in late June, 1991, did not contain the elements necessary to characterize these announcements as the start of a tender offer. Specifically, the publications were not issued by VRS or on behalf of VRS and never identified VRS as the bidder in a tender offer. The actual tender offer did not begin until August 30, 1991, and, therefore, all the relevant transactions occurred before the tender offer commenced. Thus, the Court grants the Defendants' Motion to Dismiss the Plaintiffs' federal securities law claims pursuant Fed. R.Civ.P. 12(b)(6). Furthermore, the Court declines to exercise supplemental jurisdiction over the Plaintiffs' state law claim.

In addition, the Court denies the Motion to Dismiss made by the Commonwealth Defendants based on grounds of sovereign immunity. This issue would require the Court to make certain factual determinations which are inappropriate on a motion to dismiss.