The judgment entered on Allen's convictions is affirmed.

*AFFIRMED.*

**Alan R. KAHN; Hunter A. Hogan, Jr., Plaintiffs–Appellants,**

v.

**VIRGINIA RETIREMENT SYSTEM; Systems Holdings, Incorporated; CSX Corporation; Richmond Fredericksburg and Potomac Corporation, Defendants–Appellees.**

No. 92–1284.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 27, 1992.

Decided Dec. 23, 1993.

---

Sidney B. Silverman, Silverman, Harnes, Obstfeld & Harnes, New York City, argued (Joan T. Harnes, Silverman, Harnes, Obstfeld & Harnes, New York City and Stephen T. Gannon, McSweeney, Burtch & Crump, P.C., Richmond, VA, on brief), for plaintiffs-appellants.

James E. Farnham, Hunton & Williams, Richmond, VA, argued (Anthony F. Troy, Mays & Valentine, Richmond, VA, on brief), for appellees Virginia Retirement System and System Holdings. (James L. Sanderlin, McGuire, Woods, Battle & Boothe and Stephen R. Larson, CSX Corp., Richmond, VA, on brief) for appellee CSX.

Before WIDENER, PHILLIPS, and WILLIAMS, Circuit Judges.

### OPINION

WIDENER, Circuit Judge:

Appellants, Alan R. Kahn and Hunter A. Hogan, Jr. (Kahn), owners of RF & P securities which were subject to the transactions hereinafter mentioned, appeal the dismissal of their federal securities claim against Virginia Retirement System (VRS), Systems Holdings, Inc. (SHI) (a subsidiary of VRS), CSX Corporation (CSX), and RF & P Corporation (RF & P). The district court dismissed Kahn's claim pursuant to Fed. R.Civ.P. 12(b)(6). Reviewing the decision of the district court *de novo, Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989), and accepting as true all facts alleged by Kahn, *Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 967 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992), we are of opinion that the district court properly dismissed Kahn's claim. Accordingly, we affirm.

### I.

This case arises from the restructuring of RF & P, and the dispositive issue is whether a press release[1] issued by the RF & P

1. Kahn's complaint alleges that the June 18 press release was a joint release by RF & P, CSX, and

Special Committee on June 18, 1991 commenced a tender offer under Rule 14d–2 under the Williams Act. 17 C.F.R. § 240.-14d–2. Before we address the press release in some detail, however, it is important to place it in the context of the RF & P restructuring as a whole.

Beginning in 1983 CSX wanted to purchase or otherwise control RF & P's railroad assets to gain ownership of that 113–mile rail line that would allow CSX to easily link its northern rail lines (the old Chessie system) and its southern rail lines (the former Seaboard system). See *Kahn v. Virginia Retirement System*, 783 F.Supp. 266, 267 (E.D.Va.1992). In 1985 RF & P formed a Special Committee of independent RF & P Board of Directors members to evaluate different proposals on how best to structure a deal with CSX. See 783 F.Supp. at 267. Between 1986 and 1991 the Special Committee considered and proposed various transactions that RF & P's Board of Directors (Board) rejected. See 783 F.Supp. at 267.

In February 1991 the Virginia General Assembly directed in the proposed state budget that VRS purchase, for approximately $71 million, the Commonwealth's appreciation rights on 3.5 million restricted RF & P shares held by VRS. See 783 F.Supp. at 267. These appreciation rights restricted VRS's ability to sell the RF & P shares and entitled the Commonwealth to purchase the shares from VRS at book value. The Commonwealth could then resell the shares to VRS at market price, thus allowing the Commonwealth to benefit from any realized appreciation on the shares. See 783 F.Supp. at 268. In May 1991 the Governor signed this measure into law. See 783 F.Supp. at 268.

On June 18, 1991, the Special Committee issued a press release recommending to the Board a revised transaction involving RF & P, CSX, and VRS,[2] and on June 21 the Board issued a press release agreeing in principle with the three-way transaction. 783 F.Supp. at 268. Following this press release three important transactions occurred. First, pursuant to the state budget directive, VRS transferred funds to the Commonwealth on June 28, 1991, and obtained clear title to the 3.5 million RF & P shares it held.[3] See

VRS. The district court determined that the press release was not a joint release, see *Kahn v. Virginia Retirement System*, 783 F.Supp. 266, 271 (E.D.Va.1992), and Kahn argues on appeal that the press release was joint because, although issued on RF & P stationery, it contained statements of approval by a representative of CSX and Jacqueline G. Epps, Chair of VRS's Board of Trustees. Without deciding the issue, we accept as true the facts alleged by Kahn and assume for purposes of this decision that the press release was joint between RF & P, CSX, and VRS.

**2.** The press release, issued on RF & P stationery, states in full:

*RF & P SPECIAL COMMITTEE ANNOUNCES REVISED TRANSACTION*

A Special Committee of RF & P Corporation's Board of Directors announced today that it was prepared to recommend to RF & P's Board of Directors a revised transaction among RF & P, CSX Corporation and the Virginia Retirement System in which RF & P's public shareholders would have the opportunity to receive $39 per share in cash for any and all of their shares. In the proposed transaction, CSX Corporation effectively will transfer to RF & P and VRS the approximately 6.8 million shares of RF & P it owns or controls for $35 a share and acquire the RF & P Railroad and receive certain other assets and benefits for $135 million, retaining the balance of $104 million in cash.

Speaking through its chairman, C. Coleman McGehee, the Special Committee announced that the proposed transaction still is subject to a number of conditions including negotiation of definitive agreements and approval by the RF & P Board. As a part of the proposed offer, the Special Committee will recommend that the RF & P Board not declare the regular second quarter dividend, retaining the right to declare the dividend at a later date if the transaction does not proceed.

Mr. McGehee noted that the revised transaction is a significant improvement for the public shareholders. As originally proposed in August, 1990, the public shareholders would have been able to exchange only about one-sixth of their shares at $35 a share.

Jacqueline G. Epps, Chair of the Virginia Retirement System's Board of Trustees stated that "while the negotiations have been long and complicated, it appears that everyone stands to gain from the proposed transaction."

John W. Snow, chairman and chief executive officer of CSX, said, "We are pleased with the agreement and look forward to continuing to operate the RF & P railroad as a key part of the CSX rail system."

**3.** The net effect of this transaction was that the Commonwealth received $48.21 per share. At the time of the transaction the Commonwealth had the right to purchase the shares from VRS at

*Kahn,* 783 F.Supp. at 268. On August 28, 1991, CSX and RF & P entered into an Asset Purchase Agreement under which CSX would obtain RF & P's railroad assets in exchange for 3.9 million shares of non-voting RF & P stock. See 783 F.Supp. at 268. Also on August 28, 1991, VRS and CSX entered into a Stock Purchase Agreement under which VRS would pay $105.8 million to CSX for 2.97 million shares of RF & P voting and non-voting stock.[4] See 783 F.Supp. at 268.

On August 30, 1991, SHI, a wholly-owned subsidiary of VRS created expressly to purchase and hold RF & P shares, formally issued a tender offer and commenced the three-way transaction. 783 F.Supp. at 268. On September 24, 1991, Kahn instituted this suit against VRS, CSX, and RF & P alleging violations of the § 14(d)(7) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78n(d)(7), Securities Exchange Commission (SEC) Rules 14d–10 and 10b–13, 17 C.F.R. §§ 240.10b–13 & 240.14d–10, and breach of fiduciary duty. Kahn sought damages rather than injunctive relief, and the three-way transaction continued and was completed on October 10, 1991, with the tendering of substantially all of RF & P's outstanding shares and the closing of both the Asset Purchase and the Stock Purchase Agreements. 783 F.Supp. at 268. The net effect of the transaction is best described by the district court:

> In short, RF & P is now a real estate company with no railroad operations; VRS beneficially owns substantially all of the outstanding RF & P stock; CSX owns and operates the railroad assets; and almost all of RF & P's public shareholders have

received $39.00 per share in cash for their stock and are no longer shareholders of RF & P.

783 F.Supp. at 268.

On October 23, 1991, defendants filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). In granting the motion to dismiss, the district court held that the June 18, 1991 press release of the Special Committee did not commence a tender offer and that the tender offer did not commence until the announcement by SHI on August 30, 1991. 783 F.Supp. at 271–72. Therefore, the share purchases on June 28 and August 28 did not occur during the tender offer period and thus did not violate § 14(d)(7) of the Exchange Act or Rules 14d–10 and 10b–13.[5] 783 F.Supp. at 272. Kahn now appeals.

## II.

Congress passed the Williams Act, 15 U.S.C. §§ 78m(d)–(e) & 78n(d)–(f) (amending Exchange Act and adding among others § 14(d)), in 1968 in response to the proliferation of cash tender offers as a means of effecting corporate takeovers. See *Piper v. Chris–Craft Indus.,* 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977). Unlike proxy solicitations or securities exchange offers, the traditional takeover vehicles, cash tender offers were not subject to the "disclosure requirements of the federal securities laws." 430 U.S. at 22, 97 S.Ct. at 939. Through the Williams Act Congress sought to protect investors by requiring tender offerors to make full and adequate disclosures of tender offers and by imposing certain obligations on tender offerors during the ten-

---

VRS's book value of $28 per share then resell the shares to VRS, at market price. In this instance, however, the Commonwealth sold its rights in the shares to VRS for $20.21 per right (3.5 million rights divided by $71 million) rather than purchasing and reselling the shares. This was the equivalent of the Commonwealth purchasing the shares from VRS for $28 per share and reselling the shares to VRS for $48.21 per share.

4. Under the stated terms of the Asset Purchase Agreement CSX received assets from RF & P in return for RF & P stock valued at $35 per share for purposes of the agreement. Under the stated terms of the Stock Purchase Agreement CSX and

related shareholders received from $35 to $39 per share in cash. Kahn alleges, however, that under both the Asset Purchase and Stock Purchase Agreements, CSX received more than $39.00 per share because the terms of Asset Purchase Agreement undervalued the railroad assets received by CSX.

5. After dismissing the federal securities claims, the district court, with agreement of all parties, declined to exercise supplemental jurisdiction over the state law breach of fiduciary duty claim pursuant to 28 U.S.C. § 1367(c). See *Kahn,* 783 F.Supp. at 272.

der offer period. See 430 U.S. at 22–23; 15 U.S.C. §§ 78m(d)(1), 78n(d)(1), (5)–(7).

The Williams Act becomes operative when a purchaser makes a tender offer that will result in the purchaser owning more than 5% of the class of stock sought. See 15 U.S.C. § 78n(d)(1). Although a tender offer is the threshold to the protection of the Williams Act, neither Congress nor the SEC expressly defined what constitutes a tender offer. See *Telvest, Inc. v. Bradshaw,* 618 F.2d 1029, 1032 (4th Cir.1980). While this vagueness gave courts flexibility in determining which actions constituted tender offers and thus were properly subject to the Williams Act, see *Kahn,* 783 F.Supp. at 269, the vagueness also allowed some abuses to continue that the Williams Act was designed to remedy. See SEC Exchange Act Rel. No. 34–16384 (November 29, 1979) (Release 16384) (noting problems with pre-tender offer public announcements). A prime problem was with companies making public announcements prior to commencing a tender offer. See Release 16384. These pre-tender offer announcements would generate activity normally associated with tender offers, such as arbitrage activity, and force investors to make decisions with respect to the proposed tender offer based on incomplete information. See Release 16384.

To curb this practice of bidders announcing the material terms of a tender offer prior to the formal commencement of the tender offer, the SEC promulgated Rule 14d–2. See Release 16384; 17 C.F.R. § 240.14d–2. Rule 14d–2 states that the issuance of a "public announcement by a bidder ... with respect to a tender offer ... shall be deemed to constitute the commencement of a tender offer" and thus trigger the application of the Williams Act. 17 C.F.R. § 240.14d–2(b). To commence a tender offer the public announcement must contain: "(1) The identity of the bidder; (2) The identity of the subject company; and (3) The amount and class of securities being sought and the price or range of prices being offered therefor." 17 C.F.R. §§ 240.14d–2(b) & (c). The SEC included these specific requirements to provide certainty to bidders and prevent the inadver-

tent commencement of a tender offer. See Release 16384.

Once a tender offer commences under Rule 14d–2(b) the bidder must within five days either postpone the commencement of the tender offer by making a public announcement that the tender offer will not be continued or comply with the filing requirements of the Williams Act. See 17 C.F.R. §§ 240.14d–2(b)(1) & (2). If the bidder takes no action, then the tender offer will be deemed to have commenced on the date of the public announcement and the bidder will be in violation of filing and disclosure requirements. See Release 16384; 17 C.F.R. § 240.14d–2(b). "As a result, it is not anticipated that a bidder making such a public announcement will select the 'do nothing' alternative." Release 16384. Typically, if a bidder chooses to do nothing, interested investors will seek to have the public announcement declared a tender offer and to force the bidder to comply with the disclosure requirements of the Williams Act. See, e.g., *Weeden v. Continental Health Affiliates, Inc.,* 713 F.Supp. 396, 397 (N.D.Ga.1989) (seeking to force defendant to comply with Rule 14d–2(b)(2)'s "Five Day Rule"); *American Carriers, Inc. v. Baytree Investors, Inc.,* 685 F.Supp. 800, 801 (D.Kan.1988) (seeking to enjoin defendants from making or announcing tender offer unless defendants comply with disclosure required by Exchange Act).

### III.

In light of the purpose of Rule 14d–2 and the requirements of Rule 14d–2(c), we now turn to the press release at issue. The district court determined that the press release did not commence a tender offer because it did not satisfy the requirements of Rule 14d–2(c). See *Kahn,* 783 F.Supp. at 271. Among the reasons the district court gave were that the press release did not state that there was to be a tender offer and that the press release identified neither VRS nor SHI as the bidders. See 783 F.Supp. at 271. Having reviewed the press release, we agree with the district court's findings and are of opinion that the press release does not constitute a tender offer under Rule 14d–2(b)

because it does not satisfy the requirements of Rule 14d–2(c). Even though Kahn admits that "the [press] release did not expressly mention a tender offer or VRS[,]" Kahn asserts that the press release satisfies the requirements of Rule 14d–2(c) because the press release is joint or alternatively because one can infer the required information from the press release. We will address each of these assertions in turn.

In SEC Exchange Act Rel. No. 34–16623 (March 5, 1980) (Release 16623) the SEC interpreted the tender offer rules in a question and answer format. A question directly on point states the following:

1. Question: Will a public announcement by the subject company or by another person having no relationship with a bidder of a bidder's intention to make a cash tender offer together with the information referred to in Rule 14d–2(c) commence the five business day period in Rule 14d–2(b)?

Response: No. Only a public announcement by the bidder or on the bidder's behalf will commence a tender offer pursuant to any of the provisions of Rule 14d–2. n2 As a practical matter, however, if a bidder's intention becomes generally known, the bidder may be unable to deny its intentions, and any affirmation of the information referred to in Rule 14d–2(c) by or on behalf of the bidder would cause the tender offer to start under Rule 14d–2(b).

n2 In certain situations where the bidder and the subject company agree or arrange that the subject company will make the public announcement and such public announcement does not arise solely out of the subject company's disclosure duty, the public announcement will be viewed as being made on behalf of the bidder.

Release 16623. Based upon his reading of Release 16623, Kahn alleges that the press release constitutes a tender offer because it either was made by RF & P on behalf of VRS, was a joint release, or was affirmed as a tender offer by VRS. In support of this assertion Kahn relies upon *Field v. Trump*, 850 F.2d 938 (2d Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185

(1989). In *Field*, Pay 'n Save, the target corporation, issued a press release stating "that it had reached a merger with the Trumps and that the Trumps were initiating a tender offer at $22.50." 850 F.2d at 941. The *Field* court recited that this press release by the target corporation constituted a tender offer on behalf of the bidder. 850 F.2d at 943.

Assuming as we must that the press release involved here was joint, this fact alone does not alter our decision. Under Release 16623, a joint press release will not commence a tender offer unless it also contains the specific information listed in Rule 14d–2(c). See Release 16623. The assumed jointness does not alter the fact that it neither states that there will be a tender offer nor identifies either VRS or SHI as the bidders. Therefore, we are of opinion that the press release does not commence a tender offer under Rule 14d–2(b) as construed in Release 16623.

■ As for *Field*, it supports our holding in several respects. First, the press release positively identified the Trumps as the bidders and specifically stated that the Trumps were initiating a tender offer. See *Field*, 850 F.2d at 941. In contrast, the press release at issue here did not identify the bidders and did not state that anyone was initiating a tender offer. Second, the actions by the Trumps following the press release indicated that they considered the press release to be a tender offer because they tried to withdraw the tender offer under Rule 14d–2(b)(1). See 850 F.2d at 943. In contrast, no party in this case took any action following the press release that would indicate that any party considered the press release to constitute a tender offer. Neither VRS nor SHI did anything following the press release to indicate that they considered it to be a tender offer. To the contrary, SHI expressly made the tender offer actually involved here on August 30, 1991. Furthermore, no shareholder sought to have the press release declared to have commenced a tender offer, to enjoin the alleged tender offer, or to force VRS or SHI to comply with the disclosure provisions of the Exchange Act. Although we recognize that reliance is not a necessary element to

the commencement of a tender offer by a public announcement, and neither does a failure to take early action necessarily bar a later lawsuit, the facts of this case reveal that only by virtue of hindsight has anyone considered the press release of June 18, 1991 to commence a tender offer.

◼ Alternately, Kahn asserts that "[a]lthough the June 18 press release did not expressly identify the bidder and the proposed transaction, it described them with sufficient accuracy to allow investors to discern their identity." In support of this assertion, Kahn explains that the word "exchange" used in the press release refers to a tender offer and that one can readily discern the identity of VRS as the bidder. Kahn also quotes a June 21, 1991, newspaper editorial that explained the transaction which later took place.[6] Although these inferences by Kahn and the press produce the information needed to satisfy Rule 14d–2(c), we are of opinion that Kahn's argument in this instance must fail when subjected to scrutiny in light of the purpose of Rule 14d–2.

◼ The SEC included the specific requirements of Rule 14d–2(c) to provide certainty to bidders and to prevent the inadvertent commencement of a tender offer. See Release 16384. If we were to hold that inferences alone would cause an otherwise proper public announcement to commence a tender offer, we would defeat the purpose of Rule 14d–2(c) by removing the certainty that it provides to bidders by allowing knowledgeable investors, such as Kahn, President of an investment management firm, and reporters to control the commencement of tender offers. Furthermore, the fact that the press may predict a resultant transaction from a press release is not alone sufficient to commence a tender offer. Although a tender offer may commence if a bidder's intentions become generally known and the bidder or someone on behalf of the bidder affirms the information, see Release 16623, this has not occurred in this case. Even if the newspaper editorial may indicate that VRS's intentions became generally known, Kahn has not alleged any facts indicating that VRS subse-

quently affirmed this information. Although the June 18 press release is assumed to be joint, this does not act as an affirmation by VRS of the information contained in a *subsequent* newspaper editorial.

◼ The district court decided that the only reason the Special Committee issued the press release of June 18, 1991, was to comply with the mandatory disclosure requirements of Rule 10b–5 under the Exchange Act. See 17 C.F.R. § 240.10b–5(c). We think that ruling was correct. While there does not seem to be any generally agreed upon time of disclosure for a mandatory disclosure of merger or other like negotiations, which these were, there is no doubt that such negotiations must be disclosed at some time. See *Staffin v. Greenberg,* 672 F.2d 1196 (3rd Cir. 1982), in which the court held that when an agreement in principle had been reached, a duty to disclose did exist. On June 18, 1991, the date of the press release, agreement in principle had not been reached and the negotiations, while they were certainly past the initial stages, were far from over. They yet depended, for example, on approval of the directors of RF & P, the transfer of funds to the Commonwealth, the consummation of the asset purchase agreement, and the stock purchase agreement. The Supreme Court discussed the general question in *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), and while it did not decide the question of the timing of a required announcement, it did decide the question of materiality and held that information so material as to be subject to disclosure is material when it concerns "the existence and status of preliminary merger discussions ... significant to the reasonable investor's trading decision." 485 U.S. at 235, 108 S.Ct. at 985. As we have noted, while the Court did not decide the question of timing, it did discuss the same and found

> ... no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle as to price and structure

---

**6.** *Virginia Takes Stock,* Editorial, *Wash. Times,*  June 21, 1991, at F2 (Final Edition).

has not yet been reached by the parties or their representatives.

485 U.S. at 236, 108 S.Ct. at 986. We think that the matter contained in the press release of June 18, 1991 with respect to the negotiations between CSX, RF & P, and the Virginia Retirement System were matters significant to a reasonable investor's trading decisions and thus were material. We do not decide when the disclosure of such negotiations was required, because we are of opinion that the disclosure of them at the time of the press release was appropriate to meet the disclosure requirements of the Exchange Act. Since the Special Committee, and thus RF & P, did no more than make a public announcement arising solely out of RF & P's disclosure duty, the public announcement is not viewed as being made on behalf of the bidder, the Virginia Retirement System. Release No. 16623, n. 2.

Although the inclusion of statements of other parties to the transaction in the June 18, 1991 press release may have been ill-advised, which, in view of the pleadings, has resulted in our assumption that the same was joint, we are of opinion, for the reasons we have expressed, that the press release was not a public announcement that commenced a tender offer under Rule 14d–2(b).

Accordingly, the judgment of the district court is

*AFFIRMED.*[7]

---

7. Our opinion has covered all of the "Statement of Issues," 1(a)(b), 2 and 3 found on pages 2 and 3 of appellants' brief. Issue 4, appellants' brief, p. 3, only concerns defenses asserted by defendants and was not considered. So far as any other issues may have been inferentially stated by appellants, we are of opinion they are without merit.