**In re AMERICAN EXPRESS COMPANY SHAREHOLDER LITIGATION.**

No. 91 Civ. 0256 (PKL).

United States District Court,
S.D. New York.

Dec. 22, 1993.

Greenfield & Chimicles, Haverford, PA (Kenneth A. Jacobsen and Ira Neil Richards, of counsel), Goodkind Labaton Rudoff & Sucharow, New York City (Edward Labaton and Lynda G. Jacobs, of counsel), for Lewis plaintiffs.

Wolf Haldenstein Adler Freeman & Herz, New York City (Fred Taylor Isquith, of counsel), for Lewis and Gross plaintiffs.

Milberg Weiss Bershad Specthrie & Lerach, New York City (Lee S. Shalov, Melvyn I. Weiss, Robert P. Sugarman, of counsel), for Ferber plaintiff.

Levin, Fishbein, Sedran & Berman, Philadelphia, PA (Bradford J. Lam, of counsel), for Gross plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Mark A. Belnick, Arthur L. Liman, Julie A. Domonkos, Joseph H. Brennan, Jean McMahon, of counsel), for Director defendants.

Robinson Silverman Pearce Aronsohn & Berman, New York City (James F. Gill, James M. Altman, Steven M. Stimell, of counsel), for defendant Susan Cantor.

Cadwalader, Wickersham & Taft, New York City (John J. Walsh, Steven J. Selby, Gary M. Rosen, of counsel), for defendant Harry L. Freeman.

### *OPINION AND ORDER*

LEISURE, District Judge.

This is a derivative action brought by shareholders of the American Express Company ("American Express") against several former and current directors (the "Directors") and officers of American Express. Count one of the First Amended Consolidated Complaint (the "Complaint") alleges that certain of the Directors violated section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) ("Section 14(a)"), and Rule 14a–9 of the Securities Exchange Commission, 17 C.F.R. § 240.14a–9 ("Rule 14a–9"). Count two of the Complaint alleges that all of

the individual defendants in this action violated their fiduciary duties as directors and officers of American Express. Count three of the Complaint alleges that defendants Robert Smith ("Smith"), Susan Cantor ("Cantor"), and Harry L. Freeman ("Freeman") (collectively, the "RICO Defendants") violated sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68.

The defendants move to dismiss the Section 14(a) claim pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the RICO claim pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), and to dismiss the claim for breach of fiduciary duty pursuant to Fed.R.Civ.P. 12(b)(1). The Directors also move, in the alternative, for a stay of this action. For the reasons stated herein, the Complaint is dismissed in its entirety.

## BACKGROUND

The instant suit arises out of an alleged campaign by senior officers of American Express to defame Edmond J. Safra ("Safra"), a former Vice Chairman and Director of American Express. According to the Complaint, Safra severed his ties with American Express in 1984. Approximately four years later, executives at American Express became concerned when they learned that Safra was planning to open a bank in Switzerland. To thwart his plans, the Chairman of American Express, James D. Robinson ("Robinson"), Smith, Freeman and Cantor allegedly concocted a scheme to disseminate false and defamatory information regarding Safra.

In early 1988, Cantor met with a private investigator named Antonio Giuseppe Greco ("Greco") and offered him $500,000 to facilitate the publication of adverse stories about Safra. Greco succeeded in causing various defamatory stories to be published, in one instance by paying $18,000 to the Press Secretary to the President of Peru.

In March 1988, in the midst of the alleged campaign to defame Safra, the Directors of American Express distributed a Proxy Statement (the "1988 Proxy Statement") to American Express shareholders seeking their approval of amendments to American Express's by-laws and corporate charter (the "Raincoat Provisions") (1) indemnifying American Express's directors for liability in the absence of a judgment establishing bad faith, deliberate dishonesty, or personal benefit and (2) prospectively limiting the directors' liability for breach of duty to cases involving bad faith, intentional misconduct, personal profit, or violations of a state dividend statute. The shareholders approved the Raincoat Provisions.

In June of 1989, Safra confronted Robinson with information he had obtained regarding American Express's campaign to defame him. On July 28, 1989 American Express issued a public apology to Safra for its efforts to injure his reputation and announced that it would donate $8 million to charities of his choosing.

On August 7, 1989, plaintiffs sent a letter to the Board of Directors of American Express, seeking the institution of legal proceedings with respect to claims against officers, directors and employees who had been involved in the Safra matter. Complaint at ¶ 177. After the completion of an investigation by American Express's Audit Committee, the nonmanagement directors of American Express passed a resolution that it was not in the best interests of American Express to initiate litigation with respect to the Safra matter. Plaintiffs made a second demand upon the Directors to initiate litigation, and in October 1990 this second demand was also refused.

In early 1991, plaintiffs filed three suits that were consolidated pursuant to Fed.Rule Civ.P. 42(a). On June 30, 1992 the plaintiffs filed the First Amended Consolidated Complaint at issue here. The Complaint alleges violations of RICO based on predicate acts of bribery and mail and wire fraud relating to the Safra matter; violations of Section 14(a) and Rule 14a–9 by issuance of the 1988 Proxy Statement; and violations of breach of fiduciary duty. In August of 1992, the defendants moved this Court to dismiss the Complaint.

## DISCUSSION

### I. RICO CLAIM

The RICO Defendants move this Court to dismiss the claim against them pursuant to

Fed.R.Civ.P. 12(b)(6). "[T]he court's task on a Rule 12(b)(6) motion is not to rule on the merits of plaintiffs' claims, but to decide whether, presuming all factual allegations of the complaint to be true, and drawing all reasonable inferences in the plaintiff's favor, the plaintiff could prove any set of facts which would entitle him to relief." *Weiss v. Wittcoff,* 966 F.2d 109, 112 (2d Cir.1992) (citations omitted).

## A. Proximate Cause

The defendants contend that the Complaint fails to state a claim upon which relief can be granted because plaintiffs' alleged injuries were not proximately caused by the defendants' RICO violations. The injuries include reputational harm to American Express and the costs of carrying out the Safra defamation campaign and of the subsequent settlement agreement with Safra.

■ In *Holmes v. Securities Investor Protection Corp.,* — U.S. —, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) the Supreme Court held that proximate cause, a legal concept derived from tort law, is an aspect of the requirement under section 1964(c) of RICO that a plaintiff demonstrate he has been injured "by reason of" the defendant's violation of RICO. *Id.* at —, 112 S.Ct. at 1318, 1322. The Court described this doctrine as traditionally requiring "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at —, 112 S.Ct. at 1318. Thus, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Id.* In *Holmes,* the defendants had allegedly engaged in a scheme of stock manipulation causing certain securities broker dealers to become insolvent and consequently unable to meet obligations to their customers. The plaintiff claimed to be subrogated to the rights of these customers. *Id.* at —, 112 S.Ct. at 1319. The Supreme Court held, however, that the link between the stock manipulation and the injury to the customers was too remote. *Id.*

■ *Holmes* endorsed what had been the law of this Circuit since the United States Court of Appeals for the Second Circuit (the "Second Circuit") rendered its decision in *Sperber v. Boesky,* 849 F.2d 60 (2d Cir.1988). In that case, the Second Circuit held that the injuries to the plaintiff stock purchasers had not been proximately caused by the defendant's alleged violation of RICO. The Court noted that the plaintiffs were "neither the target of the racketeering enterprise nor the competitors nor the customers of the racketeer." *Id.* at 65.

The plaintiffs in the instant case were plainly not "remote" in the same sense as the plaintiffs in *Holmes* and *Sperber.* The plaintiffs were injured not through the anonymous forces and complex interrelationships of the marketplace, but rather through their ownership of a corporation whose officers allegedly violated RICO. However, proximate cause is not limited to the concept of remoteness. In *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990), an employee alleged that he had been fired for his unwillingness to participate in his employer's RICO violations. *Id.* at 22. The employee also claimed that his commissions had decreased because customers of his employer cancelled subscriptions upon learning of the RICO fraud. The Second Circuit held as follows:

> Although Hecht's loss of employment may have been factually caused by defendants' RICO violations, it was not a foreseeable natural consequence sufficient for proximate causation.
>
> For similar reasons, Hecht's injury from loss of commissions does not confer standing ... Hecht's loss of commissions may have been factually caused by RICO violations, but was not proximately caused by the violations. Because Hecht was "neither the target of the racketeering enterprise nor the competitor[ ] nor the customer[ ] of the racketeer[s]," *see Sperber,* 849 F.2d at 65, the injury to Hecht from customers' deciding to cancel subscriptions or to withdraw business upon discovering the frauds was not reasonably foreseeable as a natural consequence of the RICO violations.

*Id.* at 24.

The instant case bears a number of similarities to *Hecht.* First, as in *Hecht,* the

plaintiffs were not the target of the racketeering enterprise. Rather, Safra was the target. Nor were the plaintiffs the competitors or the customers of the racketeers. More importantly, the injury to American Express shareholders resulted from discovery of the RICO violations. In *Hecht* the Second Circuit explicitly rejected the proposition that such injury-through-discovery causation constituted proximate cause. Thus, under the reasoning of *Hecht*, the plaintiffs' injuries plainly cannot be said to have been proximately caused.

This conclusion is supported by the Supreme Court's counsel that the concept of proximate cause "reflects 'ideas of what justice demands, or of what is administratively possible and convenient'" and that a proximate cause inquiry must therefore be carried out in light of underlying policy concerns. *Holmes*, ‒‒ U.S. at ‒‒, ‒‒ n. 20, 112 S.Ct. at 1318, 1320 n. 20 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)). Among the rationales expressed in *Holmes* for not permitting suits by parties not proximately injured was the recognition that directly injured victims can generally be counted on to vindicate the law as private attorneys general. *Id.* at ‒‒, 112 S.Ct. at 1318. This rationale applies with particular force to the instant case because injury to the plaintiffs was in fact predicated on discovery and vindication of the law by the directly injured party, Safra.

Of course, plaintiffs are likely of the view that American Express is unfairly suffering the consequences of its employees' wrongful acts. This claim, however, is not one under RICO. In finding an absence of proximate cause in *Hecht*, the Second Circuit noted that "the purpose of civil RICO liability does not extend to deterring any illegal act such as retaliatory firings for which there are state and common law remedies." *Hecht*, 897 F.2d at 24. Similarly, in the instant case, plaintiffs are incorrectly attempting to pursue claims under RICO that are more properly viewed as claims under state law relating to the defendants' duties as officers and employees of American Express.

Thus, the Court finds that the Complaint fails to state a claim under RICO upon which relief can be granted because the injuries alleged therein were not proximately caused by the defendants' alleged RICO violations.

## B. Pattern of Racketeering Activity

██ The RICO Defendants also contend that the plaintiffs have failed to plead a pattern of racketeering activity. Pleading such a pattern is required to state a claim under RICO. *See H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989). A pattern of racketeering activity exists when there is both a combination of related predicate acts and continuing criminal activity. *Id.* at 239, 109 S.Ct. at 2900. Continuity may be demonstrated by proving a series of related predicates extending over a substantial period of time. *Id.* at 242, 109 S.Ct. at 2902. In *Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir.1992) the Second Circuit observed that "there is no bright line test for determining precisely what period of time is 'substantial'" but noted that "[p]eriods of 19 or 20 months ... have been held sufficient to support a finding of continuity." *Id.* at 369.

██ Conduct with only a tenuous relationship to the RICO predicate acts will be not considered relevant for the purposes of establishing continuity. In *United States v. Biaggi*, 909 F.2d 662, 686 (2d Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991), the Second Circuit reversed a RICO conviction for which the second predicate act was attempted cover-up of the first predicate act. *Accord Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C.Cir.), *cert. denied*, ‒‒ U.S. ‒‒, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991) (period of racketeering activity not extended "merely because the conspirators take steps to bury their traces") (quoting *Grunewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957)). When RICO claims are based on predicate acts of mail fraud, innocent mailings may supply the mailing element but continuity must be establishing with reference to the instances of actual deceit. *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 46 (1st Cir.1991); *Kehr Pack-*

*ages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1414 (3d Cir.1991); *United States Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1268 (7th Cir.1990).

In the instant case, the plaintiffs contend that they have properly pled continuity by alleging a closed-ended scheme over a two and one half year period during which the defendants "were involved in numerous meetings and communications ... all in furtherance of the campaign to defame Safra." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss or Stay, dated October 30, 1992, at 53. However, plaintiffs fail to take a specific position regarding the first and last predicate acts, instead citing generally to paragraphs 75 to 151 of the Complaint. Neither the first nor the last of these paragraphs relates conduct that may be considered for the purposes of evaluating continuity. Paragraph 75 alleges a conversation in which Robinson allegedly told Freeman to investigate allegations appearing in the New York Times that a jet owned by Safra had been used to carry U.S. officials to Iran to negotiate the release of hostages. Such a conversation hardly constitutes an act of criminal deception. Paragraph 151 relates Robinson's public apology. To the extent that plaintiffs imply that the scheme should automatically be deemed to have extended to the date of Robinson's public apology, this position is plainly unfounded.

When the extraneous activity that plaintiffs seek to include is weeded out, plaintiffs' argument for a two and one half year period is simply not supported by the Complaint. The criminal activity alleged in the Complaint is carried out through Greco, who actually planted the false stories. According to the Complaint, his work on behalf of American Express began in September 1987.

Complaint at ¶ 100. In that month, Greco is alleged to have contacted the Federal Bureau of Investigation for the purpose of instigating an investigation of Safra. *Id.* at ¶ 102. Greco's first alleged contact with a reporter was in February 1988. *Id.* at ¶ 114. The last specific allegation of placing a story occurred in "June or July 1988."[1] Thus, the Complaint establishes that the actual instances of deceit occurred during a period of somewhat less than a year.

A year is midway between 19 months, which the Second Circuit has explicitly embraced as a substantial period of time, *see Metromedia*, 983 F.2d at 369, and "a few weeks or months," which has just as explicitly been rejected. *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902; *Metromedia*, 983 F.2d at 369. Accordingly, the consideration of other factors in establishing continuity is appropriate in this case.

While continuity is "centrally a temporal concept," *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902, Courts have not focussed mechanically on the raw span of time between the first and last predicate act but have instead considered a variety of factors to determine continuity. These factors include "the number and variety of predicate acts ..., the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820–21 (7th Cir.1991). *Accord Passini v. Falke–Gruppe*, 745 F.Supp. 991, 993 (S.D.N.Y.1990); *Continental Realty Corp. v. J.C. Penney Co.*, 729 F.Supp. 1452, 1454–55 (S.D.N.Y.1990). *See also Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1417–19 (3d Cir.1991) ("duration of a scheme should not be afforded overriding significance"); *Polycast Technology Corp. v. Uniroyal, Inc.*, 792 F.Supp. 244,

---

1. The Complaint also alleges that "in late 1988" Greco gave additional stories to a journalist. Complaint at ¶ 124. The Court is unwilling to consider such vague allegations in examining continuity. The plaintiff is under an obligation to specify the periods in which the conduct took place. *See Executive Photo, Inc. v. Norrell*, 756 F.Supp. 798, 804 (S.D.N.Y.1991). Plaintiffs should therefore not be rewarded for pleading that predicate acts occurred during broad periods of time. This is particularly so when the predicate acts are fraud, in light of the require-

ment of Rule 9(b) of the Federal Rules of Civil Procedure that fraud be pled with specificity. *Cf. Lange v. Hocker*, 940 F.2d 359, 362 (8th Cir.1991) (refusing to consider, for purposes of continuity analysis, allegations of fraud that were too vague to be the basis for a RICO claim.) However, even if the Court considered these allegations for the purposes of establishing continuity, this Court would not find that continuity had been established in light of the other factors considered below.

264 (S.D.N.Y.1992) (fact that scheme caused a single injury to a single victim held "pertinent to a determination of whether the defendants' conduct falls within the scope of congressional concern for 'long-term criminal conduct.'") (quoting *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902).

The balancing of various factors that is entailed in determining whether a pattern of racketeering activity exists is well illustrated by the Second Circuit's decision in *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.1989) in which it held that a complaint concerning the conversion of a large apartment complex had been well pled. While the alleged misrepresentations all appeared in a single offering plan, the Court noted that this document had been mailed to thousands of individuals and the conversion was likely to entail further fraudulent mailings. *Id.* at 1389, 1392–93. *See also H.J., Inc.*, 492 U.S. at 241, 109 S.Ct. at 2901 (declining to adopt an "inflexible approach.")

■ Turning to the instant case, the Court notes that not only does the Complaint allege a single scheme, but a single scheme with a single intended victim. Moreover, the actual dissemination of false materials was carried out by a single person, Greco. Finally, the number of predicate acts identified in the Complaint is relatively small. The Complaint mentions only four journalists to whom Greco passed stories. *See* Complaint at ¶¶ 114, 119, 123, 124. Setting aside Greco's first alleged contact with the FBI, the specific predicate acts spanned a period of only about six months.

While this Court is mindful of the Supreme Court's admonition to take a flexible approach in examining continuity, *see H.J., Inc.*, at 241, 109 S.Ct. at 2901, this Court is also aware of its responsibility not to apply this requirement so leniently that it is rendered meaningless. Taking such a balanced approach, and considering the Complaint in light of the variety of factors that courts have looked to in determining continuity, the Court holds that proof of the allegations contained therein would not establish a pattern of racketeering activity. Consequently, the plaintiffs have failed to state a claim under RICO.

## C. Predicate Acts

The Rico Defendants also contend that the plaintiffs have not sufficiently pled predicate acts under RICO. The defendants contend, *inter alia*, that the plaintiffs' mail and wire fraud allegations are inadequate because the persons deceived by the scheme (e.g., the journalists and their readers) were not the same persons injured thereby (e.g., Safra and the American Express shareholders).

■ The Second Circuit has suggested *in dictum* that such convergence between the deceived and injured parties may be necessary for violation of the mail and wire fraud statutes. *See United States v. Evans*, 844 F.2d 36, 39 (2d Cir.1988). However, this Court has twice rejected this proposition. *See Trautz v. Weisman*, 819 F.Supp. 282, 286 (S.D.N.Y.1993); *Shaw v. Rolex Watch U.S.A., Inc.*, 726 F.Supp. 969, 973 (S.D.N.Y. 1989). Thus the defendants' position is not on very solid footing.

The defendants also contend that the plaintiffs' allegations in essence state a claim for defamation and that defamation does not constitute mail or wire fraud. The only case directly on point cited by either party is *Manax v. McNamara*, 660 F.Supp. 657, 660, (W.D.Tex.1987), *aff'd*, 842 F.2d 808 (5th Cir. 1988) which supports in large measure the position of the defendants. This Court tends to agree with the defendants that the allegations in this case bear a very limited resemblance to the conduct for which persons have hitherto been convicted under the mail and wire fraud statutes. However, the Court believes it is the wiser course not to reach this issue since there is no relevant precedent in this Circuit, and since the Court has already identified two separate bases upon which to conclude that the Complaint fails to state a RICO claim. Similarly, this Court does not believe it is necessary to reach the defendants' motions to dismiss the RICO claim pursuant to Fed.R.Civ.P. 9(b).

Accordingly, the Court holds that the Complaint fails to state a claim under RICO because it does not allege facts establishing a pattern of racketeering activity nor injuries

proximately caused by the defendants' alleged RICO violations.

## II. SECTION 14(a) CLAIM

The plaintiffs charge the Directors with violating Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a–9 promulgated thereunder by issuance of the 1988 Proxy Statement seeking approval of the Raincoat Provisions. According to the Complaint, "The 1988 Proxy Statement was materially false and misleading in that it failed to disclose material facts necessary to make the statements made not misleading, including facts, *inter alia*, regarding the Company's gross mismanagement, lack of internal controls, waste of assets, and potentially illegal conduct, and the directors' utter failure to fulfill their stewardship responsibilities regarding the wrongdoing described herein." Complaint at ¶ 184. The Complaint also charges the Directors with failing "to disclose to shareholders that the officers and directors who unanimously recommended approval of the Raincoat Provisions were already subject to suit at the time they so recommended." *Id.* at ¶ 183.

■■■ Section 14(a) provides that it is unlawful to solicit a proxy contrary to rules established by the Securities Exchange Commission, and has been interpreted to provide for a private right of action. *General Time Corp. v. Talley Industries, Inc.*, 403 F.2d 159, 161 (2d Cir.1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969). Pursuant to Section 14(a), the Securities Exchange Commission has issued Rule 14a–9(a), 17 C.F.R. § 240.14a–9(a), which prohibits a solicitation of proxies that is, *inter alia*, "false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

### A. Statute of Limitations

■■■ The Directors contend that the plaintiffs' Section 14(a) claim is barred by the statute of limitations. Claims under Section 14(a) of the Securities Exchange Act must be brought within the earlier of (1) one year from discovery of the conduct constituting the violation, and (2) three years from the occurrence of such conduct. *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 364 (2d Cir. 1990). The Directors concede that this action was brought within the three year period, but not that it was brought within the one year period. The Directors assert that the plaintiffs discovered the conduct in question no later than August 7, 1989 on which date plaintiffs' co-lead counsel wrote a demand letter to the Directors concerning the Safra affair. *See* Complaint at ¶ 177.

■■■ The plaintiffs answer, *inter alia*, that New York law required them to make a demand upon the Directors before bringing the derivative action, *see* N.Y.Bus.Corp.Law § 626(c), and that the statute of limitations should run from the date that the Directors refused the plaintiffs' last demand. The Court agrees with the plaintiffs that the one year period of limitations should be extended where plaintiffs in a derivative action have made a demand upon a corporation's directors within this period. While there is apparently no case law on point, to permit the statute of limitations to run in these circumstances would clearly be inequitable.

The Directors counter that the instant action was brought more than one year after the plaintiffs' first demand upon the Directors, and that, though the litigation was commenced within one year of a second demand made by the plaintiffs, this second demand was not legally required. The Court is nonetheless unwilling to disregard the plaintiffs' second demand. The demand process plays an important role in corporate governance and the courts have every interest in encouraging this process. A second demand, even when not legally required, may be an appropriate means for shareholders to urge reconsideration upon a board of directors whose first refusal the shareholders believe was improvident. To ignore this second demand in calculating the statute of limi-

tations would discourage this potentially useful dialogue. Moreover, corporate directors will not be significantly prejudiced by extending the one year period since such demands will clearly place the directors on notice that litigation is likely.

Accordingly, this Court holds that the one year statute of limitations period ran from the date the second demand was refused in October 1990. Since this action was initiated in January of 1991, it is not time barred.

## B. Failure to Disclose Material Facts

■■■ The Defendant Directors contend the plaintiffs have failed to state a claim upon which relief can be granted because the Complaint does not allege that they failed to disclose any facts they were required to disclose under Section 14(a) and Rule 14a–9.

In *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) the Supreme Court declared itself unwilling to interpret Section 10(b) of the Securities Exchange Act of 1934 and Rule (10)(b)(5) promulgated thereunder so as to "federalize the substantial portion of the law of corporations that deals with transactions in securities." *Id.* at 479, 97 S.Ct. at 1303. Accordingly, the Court held that Section 10(b) does not prohibit "instances of corporate mismanagement ... in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Id.* at 477, 97 S.Ct. at 1303.

This unwillingness to federalize corporate law has also shaped decisions concerning the scope of Section 14(a). In *Field v. Trump*, 850 F.2d 938 (2d Cir.1988) the Second Circuit dismissed a claim under Section 14(a), reasoning as follows:

Allegations that a defendant failed to disclose facts material only to support an action for breach of state-law fiduciary duties ordinarily do not state a claim under the federal securities laws. Certainly this is true of allegations of garden-variety mismanagement, such as [of] managers failing to "maximiz[e] value for ... shareholders," ... of directors failing "to adequately inform themselves," ... or of managers acting in a generally self-entrenching fashion.

*Id.* at 948. Thus, the Second Circuit has consistently rejected attempts to "dress up" mismanagement and breach of fiduciary duty claims "in a § 14(a) suit of clothes." *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979).

However, this does not mean that facts can never be both a basis for state law fiduciary duty claims and also subject to disclosure under Section 14(a). In *Maldonado*, the Second Circuit held that when votes for the election of corporate directors are sought, Section 14(a) requires the disclosure of "the circumstances surrounding corporate transactions in which directors have a personal interest" since this information is "directly relevant to a determination of whether they are qualified to exercise stewardship of the company." *Id.* at 796. In applying this rule, the Court found that the defendants might have violated Section 14(a) by failing to disclose certain information regarding their ownership of options on the corporation's stock. *Id.* at 798.

Whether a claim under Section 14(a) is proper or merely a "dressed-up" breach of fiduciary duty claim depends in large measure upon whether deciding the claim will require the Court "to distinguish between conduct that is "'reasonable' and 'unreasonable,' or 'informed' and 'uninformed,' distinctions that are the hallmark of state fiduciary law." *Field* at 948.

In the instant case, the Directors contend that the plaintiffs' allegations are of precisely the type found inadequate in *Field*. This position is certainly supported by the language of the Complaint, which alleges that the Directors failed to disclose information "regarding the Company's gross mismanagement, lack of internal controls, waste of assets, and potentially illegal conduct, and the directors' utter failure to fulfill their stewardship responsibilities regarding the wrongdoing described herein." Complaint at ¶ 184. Plainly, this is the type of nondisclosure concerning "garden variety mismanagement" that *Field* held did not give rise to a claim under Section 14(a). *See Field*, 850 F.2d at 948. Nor are these allegations saved by inclusion of the charge that the Directors failed to disclose "potentially illegal conduct"

for "the 'proxy rules simply do not require management to accuse itself of antisocial or illegal policies.'" *GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir.1983) (quoting *Amalgamated Clothing & Textile Workers Unions v. J.P. Stevens & Co.*, 475 F.Supp. 328, 331–32 (S.D.N.Y.1979)), *vacated as moot*, 638 F.2d 7 (2d Cir.1980) (per curiam).

The Complaint also charges the Directors with failing "to disclose to shareholders that the officers and directors who unanimously recommended approval of the Raincoat Provisions were already subject to suit at the time they so recommended." Complaint at ¶ 183. Pending litigation has been held to be subject to disclosure in some instances. *See, e.g., Goldsmith v. Rawl*, 755 F.Supp. 96, 97–98 (S.D.N.Y.1991). However, neither in paragraph 183 nor elsewhere in the Complaint is it alleged that a suit had been initiated or even threatened regarding the Safra matter as of the date the Raincoat Provisions were adopted.[2] Rather, the meaning of paragraph 183, upon close scrutiny, is merely that the directors had breached their fiduciary duties and, as a consequence, were therefore allegedly subject to suit. This paragraph, then, is no more than an alternative means of phrasing the allegations made in Paragraph 184 and cannot mend the inadequacy of those allegations. Section 14(a) does not require that such uncharged, unadjudicated charges of mismanagement be disclosed. *Ciresi v. Citicorp*, 782 F.Supp. 819, 823 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992).

Concededly, this case is distinguishable in one respect from those that have hitherto been considered by the courts of this Circuit. In the instant case, plaintiffs' Section 14(a) claim relates to provisions limiting the liability of the Directors for breaches of their fiduciary duties. Section 14(a) could be found to require the disclosure of information regarding mismanagement in this context, though such information need not be disclosed in other contexts. *Cf. Goldsmith*, 755 F.Supp. at 97 ("the Court must take into account the context in which the alleged non-

disclosures occurred.") Disclosure of information regarding a breach of fiduciary duties could be held material to a vote concerning raincoat provisions since the very subject of such a vote is the limitation of liability for such breaches.

This issue was addressed by the Court of Appeals for the Third Circuit in *General Elec. Co. v. Cathcart*, 980 F.2d 927 (3d Cir. 1992). In that derivative action, the plaintiff sought to invalidate two raincoat provisions, the latter of which was adopted in the same year that an employee of General Electric was indicted for defrauding the United States Government on a computer contract. General Electric was subsequently fined over $1 million for the fraud. *Id.* at 929. The plaintiff claimed that at the time of the proxy statements the directors should have known that the fraud might give rise to legal claims against them and that Section 14(a) required the disclosure of this potential litigation. *Id.* at 935. The Third Circuit upheld the district court's dismissal of the claim pursuant to Fed.R.Civ.P. 12(b)(6) finding that the "mere possibility of litigation" against the directors was not a material fact. *Id.* at 935, 937. The Court held that "such speculative disclosure is not required under Section 14(a)," though the Court implied that the directors would have been required to disclose actual or threatened litigation. *Id.* at 935–37.

This Court agrees with the conclusions of the Third Circuit. Concededly, information that directors may have breached their fiduciary duties is of some relevance when shareholders are asked to consider raincoat provisions that would indemnify these directors or limit their liability. However, information regarding a breach of fiduciary duty is no less relevant to shareholders when called upon to elect corporate directors, but the failure to disclose such information in that context does not give rise to a claim under Section 14(a). *See United States v. Matthews*, 787 F.2d 38, 48 (2d Cir.1986); *Amalgamated Clothing v. J.P. Stevens & Co.*, 475 F.Supp. 328, 331–32 (S.D.N.Y.1979), *vacated as moot*, 638 F.2d 7 (2d Cir.1980); *Limmer v. General Tele. and Elec. Corp.*, 1978 Fed.Sec.

---

**2.** The Proxy Statement did disclose certain derivative suits unrelated to the Safra matter. *See* Declaration of Mark A. Belnick, executed August

12, 1992 ("Belnick Declaration"), Exhibit A. at 37 (the 1988 Proxy Statement).

L.Rep. (CCH) ¶ 96, 110, 1977 WL 1029 (S.D.N.Y. July 7, 1977). This unwillingness to impose liability in these circumstances reflects the counsel of the Second Circuit in *Field* that courts should not entertain Section 14(a) claims that in the final analysis turn upon "distinguish[ing] between conduct that is 'reasonable' and 'unreasonable,' or 'informed' and 'uninformed,' distinctions that are the hallmark of state fiduciary law." *Field,* 850 F.2d at 948.

This Court might escape the necessity of making these distinctions in the instant case if this suit concerned a failure to disclose actual or threatened litigation. However, the plaintiffs have not alleged that any undisclosed litigation was threatened or commenced as of the time of the 1988 Proxy Statement. Consequently, in order to determine whether the Directors violated Section 14(a) by failing to disclose the possibility of litigation, this Court would first be required to determine whether the conduct at issue should have been viewed by them as giving rise to a claim for breach of state law fiduciary duties. This is precisely the type of case turning upon determinations of fiduciary duties that the Second Circuit warned against entertaining as a Section 14(a) suit. *See Field,* 850 F.2d at 948.[3]

Accordingly, this Court holds that the plaintiffs allegations do not state a claim under Section 14(a).

## III. JURISDICTION OVER THE PENDANT STATE LAW CLAIMS

The sole basis for this Court's jurisdiction over plaintiffs' breach of fiduciary duty

claims against the defendants is this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a). A court may decline to exercise such jurisdiction when the court has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3) (Supp. I 1990) (enacted December 1, 1990). Moreover, dismissal of pendant state law claims is particularly appropriate where all federal claims have been eliminated before trial. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988); *DiLaura v. Power Authority,* 982 F.2d 73, 80 (2d Cir.1992).

The Court has dismissed both the RICO and Section 14(a) claims in this case over which it has federal subject matter jurisdiction. Accordingly, this Court dismisses the pendant state law claims pursuant to Fed. R.Civ.P. 12(b)(1) and 28 U.S.C. § 1367(c).

## CONCLUSION

For the reasons stated above, the Court hereby grants the defendants' motions to dismiss the RICO and Section 14(a) claims pursuant to Fed.R.Civ.P. 12(b)(6) and to dismiss the pendant state law claims pursuant to Fed.R.Civ.P. 12(b)(1). Accordingly, this case is hereby dismissed.

**SO ORDERED.**

---

**3.** It may be useful to observe what was in fact disclosed in the 1988 Proxy Statement regarding the Raincoat Provisions. The Proxy Statement is specifically cited within the Complaint and is the basis for the Section 14(a) claim. Accordingly, the Court may take judicial notice of the Proxy Statement in considering the Directors' 12(b)(6) Motion without translating the motion into a motion for summary judgment pursuant to Rule 56. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991). The Proxy Statement counselled the investors as follows:

In considering the proposed charter amendment, shareholders should bear in mind that the directors have a personal interest in, would potentially benefit, at the expense of shareholders, from, and may be considered to have a conflict of interest with respect to, the adop-

tion of such amendment. In addition, by adopting such an amendment, shareholders may be relinquishing possible future claims for monetary damages against directors and such amendment may thus have the effect of reducing the likelihood of derivative litigation against directors for breach of their fiduciary duty or duty of loyalty, even where such breach amounts to a grossly negligent business decision made in response to an attempt to take over the Company.

Belnick Declaration, Ex. A, at 29. These statements are useful for they illustrate the information that was most vital to shareholders in making their decision: (1) the potential cost to shareholders from approving the Raincoat Provisions and (2) the Directors' conflict.